**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

TANADGUSIX CORPORATION; BERING
SEA ECOTECH, INC.,
*Plaintiffs-Appellants,*

v.

DIERDRE HUBER, Director, Property
Management Division, General
Services Administration, in her
official capacity; STEPHEN A.
PERRY, Administrator, General
Services Administration, in his
official capacity; HECTOR V.
BARRETO, Administrator, Small
Business Administration, in his
official capacity; UNITED STATES OF
AMERICA; JAMES JOBKAR, Alaska
Department of Administration,
Division of General Services, in
his official capacity,
*Defendants-Appellees.*

No. 02-36142

D.C. No.
CV-02-00032-A-
RRB

OPINION

Appeal from the United States District Court
for the District of Alaska
Ralph R. Beistline, District Judge, Presiding

Argued and Submitted
July 7, 2004—Anchorage, Alaska

Filed April 21, 2005

Before: Cynthia Holcomb Hall, Andrew J. Kleinfeld, and
Kim McLane Wardlaw, Circuit Judges.

4583

Opinion by Judge Kleinfeld

## COUNSEL

Thomas P. Schlosser, Morisset, Schlosser, Jozwiak & McGaw, Seattle, Washington, for the appellants.

Marjorie L. Vandor (briefed), Assistant Attorney General, Alaska Department of Law, Juneau, Alaska, for appellee James Jobkar, Alaska Department of Administration.

Thomas M. Bondy, Department of Justice, Washington, D.C., for the federal appellees.

# OPINION

KLEINFELD, Circuit Judge:

We construe a federal surplus property agreement to determine whether the government correctly treated a condition of a transfer as breached.

## Fact

The Aleutian Islands extend so far west of Alaska that, crossing the 180th Meridian, they become the easternmost part of the United States. They are a two thousand-mile-long archipelago of cold, rain, snow, and wind, that separates the North Pacific Ocean from the Bering Sea. Hundreds of miles north of the Aleutians lie the even more remote Pribilof Islands, St. Paul and St. George. The islands were uninhabited, except by seals during mating season, until the Russian promyshleniki enslaved Aleuts and brought them there to harvest the seals.[1] After the United States purchased Alaska in 1867, the Aleuts living in the Pribilofs continued to harvest seals, under a federal monopoly managed for the government by its lessee, the Alaska Commercial Company.[2]

The Aleuts again faced terrible times during World War II. In 1942, the Japanese invaded the Aleutian islands of Attu and Kiska. The Japanese shipped a number of the islands' inhabitants to Japan, where many of them died in war prisons. To protect the rest of the Aleuts, the federal government evacuated them to Southeast Alaska, where they were then neglected and housed in conditions that produced consider-

---

[1]*See generally* William R. Hunt, *Alaska: A Bicentennial History* 11-31, 41-58 (1976); *Russia's American Colony* 105-43 (S. Frederick Starr ed., 1987).

[2]*See generally* Ernest Gruening, *The State of Alaska* 17-29 (1968); Claus-M. Naske & Herman E. Slotnick, *Alaska: A History of the 49th State* 23-44 (2d ed. 1987).

able disease and death. Meanwhile, after a year and a half — and a battle that produced more casualties in proportion to the number of American soldiers involved than any other battle except Iwo Jima — we won back Attu and Kiska from the Japanese.[3] But the Aleuts were still kept far from home until long after the danger had passed and only about half returned after the war.

Today, more favorable events have turned the Aleuts away from this tragic history. The Alaska Native Claims Settlement Act[4] established regional and village corporations for the native peoples of Alaska, and caused large amounts of land and money to be settled upon these native corporations. The largest community in the Pribilofs is St. Paul, a village of less than 700 people, mostly Aleuts, with a few Eskimos, Indians, and whites. The plaintiff in this case, Tanadgusix, which does business as TDX, is the St. Paul village corporation organized under the Alaska Native Claims Settlement Act. Bering Sea Ecotech is TDX's subsidiary.

Like the Aleuts, the federal government is still dealing with matters left over from World War II. A vessel called a "floating dock," the *Competent*, was built during World War II to serve the military as a dry dock. Later it was towed to Subic Bay in the Philippines, where it was used from 1969 to 1978, then towed to Guam for repairs, and finally used to support submarines in Pearl Harbor from 1980 until its deactivation in 1997. The decommissioned dry dock is now called the *Ex-Competent*.

In March 2000, TDX wrote to Alaska's senior senator asking for help getting the *Ex-Competent* transferred to the corporation through Congress — bypassing the General Services

---

[3]*See generally* Brian Garfield, *The Thousand-Mile War: World War II in Alaska and the Aleutians* 273-409 (1969); Naske & Slotnick, *supra*, at 118-39.

[4]43 U.S.C. §§ 1601-1629e.

Administration ("GSA") — to "diversify the economic opportunities for island residents." TDX told the senator that its plan was to use the dry dock "in an active shipyard outside the State of Alaska" for development of the Bering Sea's industrial infrastructure and for training the village corporation's shareholders. TDX requested a congressional transfer, rather than going through GSA, because, although GSA had helped the State of California remove a decommissioned dry dock from a foreign military sale to Turkey, GSA had not assisted Alaska in a similar effort. The planned sale of the *Ex-Competent* to Greece was cancelled only after direct intervention by Alaska's senior senator.

TDX did not succeed in getting the congressional transfer, but GSA was advised that the State of Alaska had an interest in the *Ex-Competent*. TDX wrote to the state property allocation officer involved, reiterating its interest in the vessel as "a training platform for Aleut shareholders." TDX's letter pointed out that St. Paul was "located in a remote region where the commercial infrastructure and level of development severely limits the options available for commercially viable and beneficial commerce as well as infrastructure development." This language might cause the reader to infer that TDX's plan was to move the *Ex-Competent* to St. Paul to remedy what TDX said were the problems, but the letter did not explicitly say this. As plans moved forward, TDX and a Hawaiian business, Marisco, Ltd., signed a "Letter of Understanding," agreeing that TDX would leave the *Ex-Competent* in Marisco's Hawaii shipyard for at least five years. In exchange, Marisco would tow and repair the *Ex-Competent*, pay TDX $250,000 for the use of the vessel, and ensure that "training and employment opportunities will be made available to qualified Aleuts and TDX shareholders."

There are two critical documents in this case. One is a "letter of intent" sent by TDX to the State of Alaska property officer, which was later incorporated into the document that conditionally transferred the vessel to TDX. This letter of

intent, like previous TDX letters, discusses the dire economic situation in St. Paul, which was "reeling from a collapse in crab stocks" and seeking "employment opportunities for our shareholders." The letter of intent says that Marisco's letter to TDX had been provided to GSA, and explains that Marisco's rehabilitation of the *Ex-Competent* in Hawaii was necessary before the vessel "could be feasibly and safely transported any long distances." Again, a reader might infer that TDX planned to provide employment opportunities for Aleuts and others in St. Paul by eventually bringing the *Ex-Competent* to Alaska, after the vessel was rehabilitated in Hawaii, but the letter of intent does not say so in so many words. The letter of understanding between TDX and Marisco suggests that TDX planned to keep the vessel in Hawaii for at least five years.

The most critical document in the case is GSA's "Vessel Conditional Transfer Document," since this is the paper that gave TDX the *Ex-Competent*. It states that the property is to be used "for all the following purpose(s) and plan as set forth in the Donees's 'Letter of Intent.' " Beyond that, the Vessel Conditional Transfer Document makes the transfer of title in the *Ex-Competent* from the federal government (acting through the State of Alaska) to TDX subject to several express conditions, with the property to revert to the federal government if the conditions are not met. The express conditions relevant here are first, that TDX has only twelve months to put the vessel into use for the stated purposes (condition number 3), second, that after that twelve-month period, TDX may use the vessel only for the stated purposes for another four years (condition number 4), and third, that during those five years TDX may not lease or lend the *Ex-Competent*, or "remove it permanently for use outside the State," without GSA's prior written consent (condition number 8).

GSA subsequently received an inquiry from the senior United States senator from Hawaii regarding a constituent's concerns about the *Ex-Competent*. GSA wrote the senator that

"[t]he dock will be used for economic development, including job training, in Alaska" and that "TDX certifies that there is no rent or lease agreement for use of the vessel with Marisco or any other entity." A few weeks later, in July 2001, TDX wrote GSA that "movement of the vessel across the open ocean to Alaska may prove to be impossible physically without sinking or damaging the vessel and probably not financially attainable either." TDX acknowledges in the letter that condition number 8 of the Vessel Conditional Transfer Document "forbids removing it permanently for use outside of the State [of Alaska]." The bracketed words "[of Alaska]" appear in TDX's letter. Accordingly, TDX requested that GSA "consider such a waiver that would let us operate where we are presently, and relieving the burden of moving the vessel to Alaska, that No. (8) appears to require." The State of Alaska supported consideration of a waiver.

Negotiations with GSA did not work out, so TDX and its subsidiary, Bering Sea Ecotech, sued GSA's officers for declaratory and injunctive relief. The gist of the complaint is that GSA knew all along that TDX's plan was to use the *Ex-Competent* as a training facility for Aleuts in Hawaii, that there was no place or market for the vessel in St. Paul, that GSA had misrepresented the facts in its letter to the inquiring senator from Hawaii, and that GSA was wrongfully treating TDX as being in breach of the conditions of its transfer. The injunction TDX sought would have required GSA to transfer the *Ex-Competent* to TDX's subsidiary under a different program that would allow use of the vessel in Hawaii.

On cross motions for summary judgment, the district court granted the government's motion. TDX and Bering Sea Ecotech appeal.

## Analysis

We review summary judgment de novo.[5] A contract entered

---

[5]*United States ex rel. Ali v. Daniel, Mann, Johnson & Mendenhall*, 355 F.3d 1140, 1144 (9th Cir. 2004). Because our review is de novo, we need

into under federal law by the United States and another party is controlled by general principles of federal contract law.[6] We construe the contract by reading it as a whole and interpreting each part with reference to the entire contract.[7] The terms of the contract control, regardless of the parties' subjective intentions shown by extrinsic evidence. Where there is no ambiguity in the contract, there is no genuine issue of fact.[8] "A contract is ambiguous if reasonable people could find its terms susceptible to more than one interpretation."[9]

TDX argues that the evidence establishes a genuine issue of fact about whether GSA understood full well that TDX's plan all along was to use the *Ex-Competent* in Hawaii to train Aleuts in marine repair, welding, and other marketable skills. Reading the record most favorably to the party against whom summary judgment was taken, as we must,[10] the filings could indeed establish a genuine issue of fact. The letter of intent from TDX to the State of Alaska property officer states that Marisco's letter to TDX (which manifested an intention to keep the vessel in Hawaii for at least five years) had been pro-

---

not resolve TDX's argument that, in evaluating the government's motion, the district court gave insufficient attention to the papers TDX filed in support of its own motion for summary judgment. We have examined all the papers filed by both sides in connection with their cross motions. Likewise, we need not consider TDX's argument that the district court erred by converting the government's motion from a motion to dismiss into a motion for summary judgment. The motion purported to be both, materials outside the pleadings were submitted by both sides, and both the district court and we have considered those materials with full notice.

[6]*Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1032 (9th Cir. 1989).

[7]*Id.* (citation omitted).

[8]*See Maffei v. N. Ins. Co. of New York*, 12 F.3d 892, 898 (9th Cir. 1993); *Radobenko v. Automated Equip. Corp.*, 520 F.2d 540, 543 (9th Cir. 1975).

[9]*Kennewick*, 880 F.2d at 1032 (citation omitted).

[10]*United States v. City of Tacoma*, 332 F.3d 574, 578 (9th Cir. 2003).

vided to GSA. Although TDX used the economic conditions in St. Paul to justify transferring the vessel, nowhere did TDX ever say, in so many words, that it planned to take the vessel from Hawaii to Alaska. TDX's summary judgment papers included an affidavit from its president establishing that he had explained to GSA's people the impracticality of towing the *Ex-Competent* to Alaska or using it in Alaska's small market, and explaining TDX's plan to use the vessel in Hawaii for job training of St. Paul Aleuts. According to TDX's president, he and the GSA people had agreed that either GSA would grant a waiver of the requirement that the vessel be in Alaska, or TDX would transfer the *Ex-Competent* back to GSA for retransfer to TDX's subsidiary under another federal program, for which Bering Sea Ecotech would qualify, that would not require the vessel to be in Alaska.

A trier of fact could accept these representations as true. A trier of fact could even go so far as to conclude that the people involved — on GSA's side as well as TDX's — knew full well that they were transferring to the St. Paul village corporation a vessel that would stay in Hawaii, and that the only misrepresentation made by anyone was when GSA told a senator from Hawaii that the vessel was going to be taken to Alaska. Maybe, until there was a complaint from the Hawaiian senator's constituent, GSA really did plan to make it possible for TDX to keep the dry dock there, with a waiver or a reversion and transfer under a different program.

**[1]** Perhaps TDX is right that the best way to use the *Ex-Competent* to further economic development on St. Paul Island is to fly Aleuts to Hawaii so that they can work on the vessel and learn marine trades, while Marisco sends the village corporation regular checks. Quite a few Alaskans commute a thousand miles or more to work, and many Aleuts travel as many as 2,000 miles just to see a doctor in Anchorage. There is indeed a genuine issue of fact on this record about whether, as GSA claims, TDX intended and represented during negotiations that it would take the vessel to Alaska, or

whether, as TDX claims, TDX legitimately intended and honestly represented that it would use the vessel in Hawaii for the betterment of the Aleuts in St. Paul.

**[2]** The problem for TDX is that this issue of fact is not material. Condition number 8 of the Vessel Conditional Transfer Document is unambiguous. If, after taking a year to repair the vessel, TDX did not keep it in Alaska for the following four years, title would revert to the federal government. Even if TDX's plans, hopes, and discussions were as it says, it did not get a deal in accord with them. TDX got a deal that required the vessel to be moved to Alaska.

**[3]** TDX acknowledged that its agreement with GSA required that the vessel be moved to Alaska when it sought a waiver from that agreement. TDX asked GSA for a waiver "that would let us operate where we are," which shows that TDX knew it needed a waiver to keep the *Ex-Competent* in Hawaii without losing it. And TDX acknowledged that condition number 8 prohibited permanently removing the *Ex-Competent* "for use outside of the State [of Alaska]" [*sic*]. Accordingly, TDX requested that GSA "consider such a waiver that would let us operate where we are presently, and relieving the burden of moving the vessel to Alaska, that No. (8) appears to require."

TDX argues that the word "State" in the Vessel Conditional Transfer Document is ambiguous, and that it could mean Hawaii rather than Alaska. The word is singular, so it can only mean one of those two states. This argument requires that we disregard TDX's own contemporaneous admission of what it understood condition number 8 to mean when it requested a waiver. Even if we disregard that admission, however, "State" still unambiguously meant Alaska. The Letter of Intent (which was incorporated in the Vessel Conditional Transfer Document) refers to "the State GSA Program," meaning Alaska's program. The letter states that TDX is obtaining the vessel "through the State," meaning the State of

Alaska. The letter also states that TDX has a plan for "removal" of the dry dock and for use of it to alleviate the dire economic conditions of St. Paul Island, and it says that Marisco's Hawaii shipyard is "where rehabilitation will take place." The phrase "the State" in the Letter of Intent unambiguously means the State of Alaska. Though, in the Letter of Intent, TDX never explicitly says that it plans to take the *Ex-Competent* 5,000 miles north from Pearl Harbor to the Pribilof Islands, condition number 8 of the Vessel Conditional Transfer Document explicitly says that TDX will.

TDX offers a reading of the relevant GSA regulations[11] that would permit a conditional transfer under the program, even though the transferee planned to permanently use the property outside the state. And TDX offers an argument, as explained above, that GSA personnel said GSA would work something out — a waiver, or a reversion and retransfer under another program — so that TDX could keep the dry dock permanently in Hawaii. Neither matters, however, because the only conveyance made was the one made in the Vessel Conditional Transfer Document. That document unambiguously required the *Ex-Competent* to be taken to Alaska within a year and then used in Alaska for at least four years before TDX could get unencumbered title. Whatever deal TDX could have made with GSA, this is one it actually made.

**[4]** The Vessel Conditional Transfer Document unambiguously establishes that the *Ex-Competent* reverts to the federal government if the vessel is not kept for four years in Alaska. TDX did not satisfy the condition and the reversion properly occurred.

**AFFIRMED.**

---

[11]41 C.F.R. §§ 101-44.206(d), 102-37.265 (2001).