**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MICHAEL NEWMAN, | No. 24-1493 |
| *Plaintiff - Appellant*, | D.C. No. 5:23-cv-00033-SP |
| v. | |
| TODD UNDERHILL, Deputy; JONATHAN BARMER, Deputy; LAUREN LAIDLAW; JAMES BLANKENSHIP; COUNTY OF SAN BERNARDINO, | OPINION |
| *Defendants - Appellees*. | |

Appeal from the United States District Court
for the Central District of California
Sheri Pym, Magistrate Judge, Presiding

Argued and Submitted February 12, 2025
Pasadena, California

Filed April 23, 2025

Before: Susan P. Graber, David F. Hamilton, and Patrick J. Bumatay, Circuit Judges.[*]

Opinion by Judge Graber

---

[*] The Honorable David F. Hamilton, United States Circuit Judge for the Court of Appeals, 7th Circuit, sitting by designation.

## SUMMARY[**]

### Fourth Amendment/Hot Pursuit Exception

The panel affirmed the district court's summary judgment for San Bernardino County Sheriff's Department deputies in an action brought pursuant to 42 U.S.C. § 1983 alleging Fourth Amendment violations when deputies entered plaintiff's home without a warrant while pursuing a fleeing suspect.

The district court granted summary judgment to defendants, reasoning, in relevant part, that no Fourth Amendment violation occurred because the hot-pursuit exception to the warrant requirement applied.

In affirming the district court, the panel first held that, as a matter of law, defendants had probable cause for the entry. Under the circumstances, a reasonable person in Deputy Underhill's shoes would have believed that there was at least a fair probability that the suspect was in plaintiff's home. The panel next held that Underhill's pursuit of the suspect constituted an exigent situation justifying the entry because the officers were in immediate and continuous pursuit of a suspect from the scene of the crime at the moment they made entry. Underhill gave chase immediately after seeing the suspect fail to yield to a traffic stop, a felony, and fleeing in his truck after being instructed to stop. Notwithstanding the nine-minute delay between

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Underhill losing sight of the suspect and Underhill entering plaintiff's home, the continuity of the chase remained intact.

---

**COUNSEL**

Alex Coolman (argued), Law Office of Alex Coolman, San Diego, California, for Plaintiff-Appellant.

Daniel S. Roberts (argued), ColeHuber LLP, Ontario, California, for Defendants-Appellees.

---

**OPINION**

GRABER, Circuit Judge:

Deputy Todd Underhill of the San Bernardino County Sheriff's Department gave chase when the driver of a truck feloniously failed to heed Underhill's instruction to stop. The suspect eventually parked near Plaintiff Michael Newman's home, got out of the truck, and ran. Underhill followed on foot but lost sight of the suspect somewhere near the rear of the house. While waiting for backup, he searched the surrounding area but did not find the suspect. When another officer arrived, Underhill explained that he thought the suspect could be inside the house and that the house's backdoor was unlocked. Less than ten minutes later, Underhill and other officers entered the house and discovered Plaintiff. After questioning the legality of their entry, Plaintiff allowed the officers to search for the suspect (Plaintiff's roommate), whom the officers quickly found.

Plaintiff brought this action, raising both federal and state claims predicated on an alleged violation of his Fourth Amendment rights. The district court granted summary judgment to Defendants, reasoning, in relevant part, that no Fourth Amendment violation occurred because the hot-pursuit exception to the warrant requirement applied. Reviewing de novo, Perez v. City of Fresno, 98 F.4th 919, 924 (9th Cir. 2024), we affirm.

## BACKGROUND

In the early hours of July 27, 2022, Sheriff's Deputy Todd Underhill attempted to pull over a black Chevy Silverado that had an expired registration and an unilluminated license plate. The Silverado's driver—later identified as Richard Delacruz—fled, and Underhill immediately pursued. Eventually, Delacruz got out of his truck on a dead-end street and ran away on foot. Underhill followed, also on foot, stopping briefly to "clear" the Silverado before continuing the pursuit.

Having lost sight of Delacruz, Underhill reported to dispatch that Delacruz had been "[l]ast seen toward the residence at 4083 Camellia Drive"—Plaintiff Michael Newman's home. The house sits on a hill, with "drop offs" between it and adjacent properties and with fencing—which, in some places, is only waist high—around the perimeter of the backyard.[1]

Underhill ran toward Plaintiff's backyard and, not seeing Delacruz, decided to wait for backup before continuing the

---

[1] Underhill later declared that he saw Delacruz "open a gate and go into the backyard" and heard "a noise consistent with a door opening and closing," although Underhill mentioned those details in neither his incident report nor his probable-cause statement.

pursuit.  Deputy Jonathan Barmer arrived roughly two minutes later.  According to the transcript of the audio from Underhill's belt recorder, Underhill told Barmer that Delacruz had gone "somewhere over to the rear of the residence."[2]  Underhill also stated that he "th[ought]," but did not "know," that Delacruz "may" have entered Plaintiff's home.

Underhill and Barmer searched the backyard for Delacruz with their flashlights, while deputies in a Sheriff's Department helicopter looked for heat signatures from overhead.  The deputies neither saw any sign of Delacruz nor heard any noises—such as the rattling of a fence—to suggest that he had left the backyard.  For their part, the deputies in the helicopter detected heat coming from Plaintiff's home but could not confirm who or what was emitting it.

During or shortly after inspecting the backyard, Underhill noticed something about Plaintiff's backdoor. Underhill's belt-recorder first captured him saying:  "Yeah[,] because he came and locked that door, dude."  It is not clear from the record what Underhill meant by that statement. Underhill was also recorded stating:  "We got an unlocked rear door."  Underhill later testified at his deposition that the backdoor had been "slightly ajar[]."

About seven minutes after Delacruz fled his truck on foot, Underhill began announcing the Sheriff's Department's presence and ordering any occupants of the home to exit.  Underhill continued to make those announcements for another two minutes.  During that period,

---

[2] The record before us contains competing and somewhat inconsistent transcripts of this recording, but not the recording itself.  Because we are reviewing a summary judgment in Defendants' favor, we rely on Plaintiff's submission.

Underhill heard at least one voice coming from inside the house, and Deputy Lauren Laidlaw arrived at the scene.

Roughly nine minutes after last seeing Delacruz, Underhill—accompanied by Laidlaw and Barmer—entered Plaintiff's home through the backdoor. Hearing Plaintiff's voice coming from elsewhere in the house, Underhill found Plaintiff's room and discovered that Plaintiff is "a quadriplegic in a wheelchair." During their ensuing conversation, which grew contentious at times, Plaintiff told Underhill that his roommate drove a black Chevy Silverado.

About eight minutes after Underhill entered the house, Sergeant James Blankenship joined Underhill and Plaintiff. After another four minutes of conversation, Plaintiff gave the officers consent to look for his roommate in a different part of the house. The officers quickly found and arrested Delacruz, who was later convicted of a felony—evading a peace officer with wanton disregard for safety, in violation of California Vehicle Code section 2800.2(a).

Plaintiff sued Defendants Underhill, Laidlaw, and Blankenship, asserting a claim under 42 U.S.C. § 1983 for unreasonable search in violation of the Fourth Amendment. The operative complaint also lists two state-law causes of action.[3] The district court entered summary judgment in favor of Defendants on all claims. Plaintiff timely appeals.

## DISCUSSION

All three of Plaintiff's claims are predicated on the allegation that Defendants violated Plaintiff's Fourth

---

[3] Additionally, Plaintiff brought a claim under Monell v. Department of Social Services, 436 U.S. 658 (1978), against San Bernardino County. The district court granted summary judgment to the County on that claim, a decision that Plaintiff does not challenge in this appeal.

Amendment rights when they entered his home without a warrant.[4] Because the record before us does not support that allegation, each of Plaintiff's claims fails.[5]

Under the Fourth Amendment's guarantee against unreasonable searches, one's home is "the most constitutionally protected place on earth." United States v. Craighead, 539 F.3d 1073, 1083 (9th Cir. 2008); see also, e.g., Fisher v. City of San Jose, 558 F.3d 1069, 1082 (9th Cir. 2009) (en banc) ("[T]he home is perhaps the most sacrosanct domain, where one's Fourth Amendment interests are at their zenith."); Florida v. Jardines, 569 U.S. 1, 6 (2013) (describing "the home" as the "first among equals"). Accordingly, the government ordinarily may not search someone's home without "a criminal warrant supported by probable cause." United States v. Grey, 959 F.3d 1166, 1177 (9th Cir. 2020).

Nonetheless, there are a few narrow exceptions to the warrant requirement. Sandoval v. Las Vegas Metro. Police Dep't, 756 F.3d 1154, 1161 (9th Cir. 2014). As relevant here, "the exigencies of [a] situation" sometimes "make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable." Lange v. California, 594 U.S. 295, 301 (2021) (second alteration in original) (quoting Kentucky v. King, 563 U.S. 452, 460 (2011)). Situations

---

[4] Most of Plaintiff's arguments are framed as critiques of the district court's construction of the evidence. But because our review is de novo, we do not consider whether "the district court gave insufficient attention" to certain aspects of the record. Tanadgusix Corp. v. Huber, 404 F.3d 1201, 1205 n.5 (9th Cir. 2005).

[5] We therefore do not address the parties' arguments pertaining to (1) qualified immunity's "clearly established law" prong or (2) secondary questions regarding Plaintiff's state-law causes of action.

involving "the hot pursuit of a fleeing suspect" can fit that description. United States v. Struckman, 603 F.3d 731, 743 (9th Cir. 2010). Underlying the so-called hot-pursuit exception is the principle that "a suspect may not defeat an arrest which has been set in motion in a public place . . . by the expedient of escaping to a private place." United States v. Santana, 427 U.S. 38, 43 (1976).

To rely on the hot-pursuit exception, Defendants must establish that (A) they had probable cause to search Plaintiff's home and (B) "exigent circumstances"—here, the pursuit of a fleeing suspect—"justified the warrantless intrusion." United States v. Johnson, 256 F.3d 895, 905 (9th Cir. 2001) (en banc) (per curiam). On this record, we hold that Defendants have satisfied both requirements as a matter of law.

A.  Probable Cause

To establish probable cause in this case, Defendants must show that, when Underhill entered Plaintiff's home, "the 'facts and circumstances' before [him were] sufficient to warrant a person of reasonable caution to believe" that Delacruz would be found therein. Id. at 905; see also United States v. Scott, 520 F.2d 697, 700 (9th Cir. 1975) (framing the question of probable cause, in a case about the "exigencies of hot pursuit," as "whether the officers . . . had, at the time of entry, probable cause to believe that the fugitives they sought were there"). As that description suggests, and despite Plaintiff's contention to the contrary, "probable cause means 'fair probability,' not certainty or even a preponderance of the evidence." United States v. Gourde, 440 F.3d 1065, 1069 (9th Cir. 2006) (en banc) (emphasis added) (quoting Illinois v. Gates, 462 U.S. 213, 246 (1983)). "Whether there is a fair probability . . . is a

'commonsense, practical question'" that "depends upon the totality of the circumstances, including reasonable inferences." United States v. Kelley, 482 F.3d 1047, 1050 (9th Cir. 2007) (quoting Gourde, 440 F.3d at 1069).

To create a genuine factual dispute regarding probable cause, Plaintiff relies on the purported presence of "ambiguity" in the record as to "when and where exactly . . . Underhill lost track of [Delacruz]." But to the extent that any such ambiguity exists, it is immaterial. The following facts are not in dispute: (1) Underhill saw Delacruz running toward the back of the house; (2) Underhill, having searched the area, knew that Delacruz was not hiding in the backyard; (3) if Delacruz had tried to move from the backyard to an adjacent property, he would have been hindered by fencing and by drop-offs in the terrain; (4) Underhill found the backdoor unlocked; and (5) as demonstrated by his contemporaneous statements, Underhill perceived someone interacting with the backdoor at some point during the pursuit. [6] Faced with those circumstances, a reasonable person in Underhill's shoes would have believed that there was at least a fair probability that Delacruz was in Plaintiff's home. We do not see, and Plaintiff does not identify, anything in the record to dispel such a reasonable belief.

We therefore hold that, as a matter of law, Defendants had probable cause to believe that Delacruz was inside

---

[6] We need not resolve whether a reasonable juror necessarily would credit Underhill's statement—made only in a declaration—that he "heard . . . a noise consistent with a door opening and closing" after seeing Delacruz enter Plaintiff's backyard. Even disregarding that statement, the undisputed evidence described in the text demonstrates the absence of a genuine dispute of material fact regarding probable cause.

Plaintiff's home.  See Johnson v. Barr, 79 F.4th 996, 1003 (9th Cir. 2023) (explaining that summary judgment on the issue of probable clause is appropriate only "when there is no genuine issue of fact and if 'no reasonable jury could find an absence of probable cause under the facts'" (quoting Gasho v. United States, 39 F.3d 1420, 1428 (9th Cir. 1994))).

B.  Hot Pursuit

In addition to establishing probable cause, Defendants must show that Underhill's pursuit of Delacruz constituted an exigent situation justifying the entry into Plaintiff's home. Johnson, 256 F.3d at 907.

In our circuit, a "hot pursuit" excuses a warrantless intrusion into the home only if the "officers [were] in 'immediate' and 'continuous' pursuit of a suspect from the scene of the crime" at the moment they made entry.  Id. (quoting Welsh v. Wisconsin, 466 U.S. 740, 753 (1984)). Other relevant considerations include "the gravity of the underlying offense for which the arrest is being made," id. at 908 (quoting Welsh, 466 U.S. at 753), and whether "the officers encroached on the property of a person who did not create the exigent circumstances and was completely unrelated to the suspect and his [crimes]," id. at 909.

In this case, we need deal only with the exception's "immediacy" and "continuity" requirements.  Respecting the gravity of the offense, Plaintiff does not dispute that Underhill observed Delacruz committing a felony. Although the Supreme Court has not decided whether all felonies give the police license to chase someone into their home without a warrant, see Lange, 594 U.S. at 304–05 (assuming, but not deciding, that "fleeing-felon cases . . . always present[] exigent circumstances") (emphasis omitted); Johnson, 256 F.3d at 908 n.6 ("In situations where

an officer is truly in hot pursuit and the underlying offense is a felony, the Fourth Amendment usually yields." (emphasis added)), we need not resolve that question because Plaintiff does not argue that Delacruz's crime fails to qualify for the "hot pursuit" exception. And no party discusses the effect of Plaintiff's relationship to Delacruz, a factor that, in general, "[v]ery few cases have considered." Johnson, 256 F.3d at 909.

### 1. Immediacy

We need not dwell long on the question of immediacy. It is undisputed that Underhill gave chase "immediately" after seeing Delacruz fail to yield to a traffic stop—thereby committing a felony—and flee in his truck.

Plaintiff suggests that, in this context, "immediate" means that the warrantless search must "follow immediately, in a temporal sense, from the underlying pursuit." But that interpretation would render the word "continuous"—which, on its own, denotes that a pursuit stops being "hot" once it ends—meaningless. More to the point, Johnson made clear that an officer satisfies the requirement of immediacy if the officer gives chase as soon as the suspect flees from the scene of the crime. See id. at 907 (asking whether the officers were in "immediate . . . pursuit of a suspect from the scene of the crime" (emphasis added) (internal quotation marks omitted)).

### 2. Continuity

Plaintiff argues that, because nine minutes elapsed between Underhill's losing sight of Delacruz and Underhill's entering Plaintiff's home, a genuine dispute of material fact exists regarding the continuity of the pursuit. We disagree.

Johnson contains our most thorough exploration of the continuity requirement. There, the suspect fled into the woods, and the officer—concerned for his safety—decided not to follow until backup arrived. Johnson, 256 F.3d at 907–08. While waiting for his colleagues, the officer returned to the scene of his initial confrontation with the suspect. Id. at 907. Thirty minutes passed, during which time the suspect "was free to run," and during which time the police neither saw the suspect nor "received [any] new information about where [he] had gone." Id. at 908. Addressing the hot-pursuit exception, we made clear that, in certain circumstances, the decision to wait for backup "delay[s], but [does] not br[eak]," the "'continuity' of the chase." Id. We explained, however, that because the officers in Johnson had no clue where the suspect was for more than 30 minutes, the chase's continuity had been "clearly broken." Id.

We discern two interrelated considerations underlying the distinction that Johnson drew between "delayed continuity" and "broken continuity." First, we focused on whether, and to what degree, the officers lost track of the suspect's whereabouts. On one end of the spectrum, the continuity of the chase is more likely to survive when "police officers always kn[o]w exactly where the suspect [is]." Id. (emphasis added). On the other end sit cases like Johnson, in which the officers "no longer had any idea where [the suspect] was" by the time they resumed their search. Id. (emphasis added). Second, we examined whether the officers, after losing sight of the suspect, continued to act with speed in attempting to apprehend the suspect. In Johnson, the government's "continuity" showing was undermined by the fact that the officer did not "monitor [the suspect's] movements while waiting for his backup to

arrive," but instead went to retrieve an item that he had dropped earlier. Id. Relevant to both considerations is the question of timing. The more time passes without the officer's physically chasing after the suspect—whether because the officer loses track of the suspect or because the officer stops attempting to apprehend the suspect—the more likely the continuity of the chase is to break. See id. (stressing that the suspect was left "free to run for over a half hour").[7]

Applying those principles to the undisputed facts in the record, we conclude that, when Underhill entered Plaintiff's home, the continuity of the chase remained intact. Regarding the first consideration identified above, the nine-minute "pause" identified by Plaintiff is far shorter than the 30-minute period at issue in Johnson. The undisputed evidence supporting the existence of probable cause also demonstrates that, during those nine minutes, Underhill had a reasonably good idea where Delacruz was hiding. [8]

---

[7] Because "the Fourth Amendment ultimately turns on the reasonableness of the officer's actions in light of the totality of the circumstances," Struckman, 603 F.3d at 743, we do not suggest that these are the only considerations that might ever factor into a court's continuity-of-pursuit analysis. Still, we note that the D.C. Circuit has taken an approach similar to ours. See United States v. Dawkins, 17 F.3d 399, 407 (D.C. Cir.) ("[S]peed and a continuous knowledge of the alleged perpetrator's whereabouts are the elements which underpin th[e] [hot-pursuit] exception . . . ." (quoting United States v. Lindsay, 506 F.2d 166, 173 (D.C. Cir. 1974))), amended, 327 F.3d 1198 (D.C. Cir. 1994).

[8] The probable-cause and exigent-circumstances inquiries often overlap to some degree. See United States v. Brooks, 367 F.3d 1128, 1135 (9th Cir. 2004) ("Many of the same facts that showed probable cause to suspect evidence of crime are also relevant to show Perez's exigent need to enter.").

Johnson's second variable points in the same direction.  Far from leaving the trail to await backup, Underhill spent most, if not all, of the nine minutes in question actively working to find and apprehend Delacruz.  He searched the backyard, announced the Sheriff's Department's presence, and coordinated with fellow officers—including those keeping watch from a helicopter.  Conversely, Plaintiff points to no evidence that would allow us to infer that Defendants ceased their pursuit of Delacruz after Underhill lost sight of him.

In sum, on this record there is no genuine issue of material fact suggesting that the continuity of the chase was broken before Underhill entered Plaintiff's home.

**AFFIRMED.**