**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| GENOA JONES; CORNELL TINSLEY, | No. 24-3374 |
| *Plaintiffs - Appellants*, | D.C. No. 2:21-cv-00241-CDS-DJA |
| v. | |
| CITY OF NORTH LAS VEGAS; SCOTT SALKOFF; MICHAEL ROSE, | OPINION |
| *Defendants - Appellees*. | |

Appeal from the United States District Court
for the District of Nevada
Cristina D. Silva, District Judge, Presiding

Argued and Submitted May 22, 2025
San Francisco, California

September 8, 2025

Before: Michelle T. Friedland and Salvador Mendoza, Jr., Circuit Judges, and Robert S. Lasnik, District Judge.[*]

Opinion by Judge Mendoza

---

[*] The Honorable Robert S. Lasnik, United States District Judge for the Western District of Washington, sitting by designation.

# SUMMARY[**]

## Fourth and Fourteenth Amendments

The panel affirmed in part and reversed in part the district court's summary judgment in favor of the City of North Las Vegas and two police officers in plaintiffs' action alleging that defendants violated their Fourth and Fourteenth Amendment rights when the officers physically intruded into plaintiffs' backyard without permission while searching for a suspect, and one of the officers shot and killed two of plaintiffs' dogs after the dogs attacked the police K-9.

The panel reversed the district court's grant of qualified immunity and summary judgment to the individual police officers with respect to their search of plaintiffs' backyard. Defendants could not avail themselves of the "hot pursuit" exception to the Fourth Amendment's warrant requirement, which only applies when officers are in "immediate" and "continuous" pursuit of a suspect from the scene of the crime. Here, the continuity of the pursuit was broken when defendants lost track of the suspect's whereabouts for eighteen minutes. Because defendants lacked an exigent circumstance to search plaintiffs' yard under clearly established law at the time of the incident, they were not entitled to qualified immunity.

The panel reversed the district court's dismissal of plaintiffs' state law claim because the district court declined to exercise supplemental jurisdiction over the claim solely

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

based on its grant of summary judgment to defendants on all of plaintiffs' federal claims.

The panel affirmed the district court's summary judgment for Lieutenant Salkoff, holding that he was entitled to qualified immunity with respect to his use of force against plaintiffs' dogs because, given the spontaneous confrontation, the panel could not say that he violated clearly established law.

The panel affirmed the district court's summary judgment on plaintiffs' *Monell* claims pertaining to both the warrantless search and use-of-force claims. Plaintiffs offered no evidence of a pattern of warrantless search violations or other evidence establishing that the City was deliberately indifferent to plaintiffs' Fourth Amendment rights or that its conduct had become a traditional method for carrying out policy.

The panel remanded for further proceedings.

## COUNSEL

Margaret A. McLetchie (argued) and Leo S. Wolpert, McLetchie Law, Las Vegas, Nevada; Jennifer L. Braster, Naylor & Braster, Las Vegas, Nevada; for Plaintiffs-Appellants.

Rhiann J. Denman (argued) and Noel E. Eidsmore, Chief Deputy City Attorneys; Micaela R. Moore, Former City Attorney; Andrew D. Moore, City Attorney; North Las Vegas Office of the City Attorney, North Las Vegas, Nevada; for Defendants-Appellees.

**OPINION**

MENDOZA, Circuit Judge:

When does a hot pursuit turn cold? Today we conclude that a pursuit is at best lukewarm, and certainly no longer hot pursuit, when officers lose a suspect's trail in a residential neighborhood for eighteen minutes.

A police officer saw a suspect flee from the back of a house into a neighboring backyard. Instead of directly following the suspect, the officer hurried to his car, called for backup, and drove two blocks south to establish a perimeter around the area. At least eighteen minutes passed before a K-9 unit alerted in the direction of Plaintiffs' backyard, several houses away from where the suspect had disappeared. An officer with a K-9 searched the yard, rousing Plaintiffs' three dogs. Two of the dogs attacked the police K-9 and were shot and killed by an officer.

Plaintiffs Genoa Jones and Cornell Tinsley sued under 42 U.S.C. § 1983, claiming the officers and the City of North Las Vegas violated their Fourth Amendment right to be free from unwarranted searches and seizures. The district court granted summary judgment for the officers, reasoning that the officers' intrusion was permitted by the hot pursuit exception to the warrant requirement and that the use of force was reasonable under the circumstances. The district court also granted summary judgment for the city, finding no support for Plaintiffs' failure-to-train theory.

We reverse, in part, holding that there is no hot pursuit where officers lose track of a suspect for eighteen minutes. We affirm with respect to the K-9 handler's use of force and

the claims against the city. We remand for further proceedings.

## I.

On February 15, 2019, at 3:47 p.m., North Las Vegas Police Department ("NLVPD") Officers Joseph Minelli ("Officer Minelli") and Michael Rose ("Officer Rose") responded to a possible domestic battery at a house on a residential cul-de-sac. While Officer Minelli spoke with a woman at the door, Officer Rose moved to the side of the house, where he witnessed a person flee over the back wall to the south into a neighboring yard. Officer Rose ran to his patrol car to request assistance. He drove two streets south hoping to cut off whomever had fled but did not catch sight of the person again. Several units quickly responded and helped Officer Rose establish a multiple-block perimeter around the area.

Meanwhile, Officer Minelli stayed at the home to investigate the domestic battery allegation. The woman who answered the door denied that there was any domestic violence, but Officer Minelli observed injuries on her face, including several injuries around her eyes and a long cut across her chin that had been stitched. The woman told Officer Minelli that police were not welcome at her house and that her boyfriend—whom officers suspected had battered the woman and whom they believed to be the person who fled—would be back that evening and police would need a warrant to apprehend him at the home. Officer Minelli remained at the address in case the suspect returned.

With a perimeter in place, officers believed nobody could leave the area without crossing their line of sight. A sergeant on scene decided to call for a K-9 unit to search for the suspect. NLVPD Lieutenant Scott Salkoff ("Lieutenant

Salkoff") and his police K-9 Storm ("Storm") responded to the scene around 4:05 p.m., approximately eighteen minutes after Officer Rose saw the suspect flee.

Lieutenant Salkoff used Storm—who is trained to detect the odor of apocrine, a hormone some people release when they are afraid—to search within the perimeter. Lieutenant Salkoff informed residents of the searches using his patrol car's public address system. He also sent NLVPD Officer Lee Young ("Officer Young") ahead to seek consent from residents to search their yards.

Lieutenant Salkoff was searching a backyard four houses east and one house south of where the suspect vanished when Storm alerted to an odor coming from a distant, elevated position in the direction of Plaintiffs' walled-in backyard.[1]

Lieutenant Salkoff decided to search Plaintiffs' backyard. He had Officer Young check the gate, which was locked and posted with a "Beware of Dog" sign. Officer Young knocked on Plaintiffs' door to request their consent to search the yard but received no response because they were not home. To gain a vantage, Lieutenant Salkoff jumped onto the six-foot cinderblock wall that enclosed Plaintiffs' yard. He observed trash cans, where he thought the suspect might be hiding, and a fenced-in kennel area with

---

[1] We know Storm's alert came at least eighteen minutes after officers had last seen the person they were looking for—and, on the record before us, it may have been much later. Officer Rose saw someone flee at around 3:47 p.m. and Lieutenant Salkoff responded to the scene with Storm at approximately 4:05 p.m. Lieutenant Salkoff does not recall precisely when or where he started his search and says he may have searched one yard or more than a dozen yards before Storm smelled fear in the air. Officer Rose recalls that the search lasted for more than an hour and possibly for two or three hours.

an open gate and three dog houses and bowls but did not see any dogs.

With neither a warrant nor Plaintiffs' consent, Lieutenant Salkoff hopped down from the wall into their backyard. Officer Rose then passed Storm over the wall. Plaintiffs' three dogs were stirred from their doghouses, emerging to investigate the unwelcome strangers in their yard. Lieutenant Salkoff attempted to keep the dogs at bay, kicking them and placing trash cans between them and Storm. His efforts deterred one dog, but the other two—Shadow and Whitewall—attacked Storm. Lieutenant Salkoff drew his service weapon and killed both Shadow and Whitewall.

Despite officers scouring the neighborhood, they never found the person they were looking for.

Plaintiffs sued Lieutenant Salkoff, Officer Rose, and the City of North Las Vegas ("the City"), asserting several claims under 42 U.S.C. § 1983: Lieutenant Salkoff violated the Fourth and Fourteenth Amendments when, without a warrant, he entered Plaintiffs' backyard, and Officer Rose violated the same when he passed Storm into the yard; Lieutenant Salkoff violated the Fourth and Fourteenth Amendments when he unreasonably seized their dogs by shooting them dead; and the City was deliberately indifferent to the risk of these violations. Plaintiffs also brought a state law claim that Lieutenant Salkoff and the City violated Nevada Revised Statutes § 41.130.

The district court granted Defendants' motion for summary judgment on the constitutional claims, declined to exercise supplemental jurisdiction over the remaining state law claim, and entered judgment for Defendants. Plaintiffs timely appeal.

## II.

We review a district court's grant of summary judgment de novo, *Spencer v. Pew*, 117 F.4th 1130, 1137 (9th Cir. 2024), including officers' entitlement to qualified immunity, *Sanderlin v. Dwyer*, 116 F.4th 905, 910 (9th Cir. 2024). In conducting this review, we take "the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Nehad v. Browder*, 929 F.3d 1125, 1132 (9th Cir. 2019); Fed. R. Civ. P. 56(e).

Qualified immunity protects government officials from liability under § 1983 "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *Waid v. County of Lyon*, 87 F.4th 383, 387 (9th Cir. 2023) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018)). "Either prong can be adjudicated on appeal by taking the facts as most favorable to the plaintiffs and applying the pertinent legal standards to those facts." *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 945 (9th Cir. 2017). Defendants are entitled to qualified immunity where we find "a negative answer at either step." *Sabbe v. Wash. Cnty. Bd. of Comm'rs*, 84 F.4th 807, 819 (9th Cir. 2023).

## III.

"When a law enforcement officer physically intrudes on the curtilage" of a home, like a walled-in backyard, "a search within the meaning of the Fourth Amendment has occurred." *Collins v. Virginia*, 584 U.S. 586, 593 (2018). "[A] small, enclosed yard adjacent to a home in a residential neighborhood . . . is 'curtilage' subject to Fourth Amendment protection." *United States v. Struckman*, 603 F.3d 731, 739 (9th Cir. 2010) (quoting *United States v. Romero-Bustamente*, 337 F.3d 1104, 1108 (9th Cir. 2003)).

Such searches are "presumptively unreasonable absent a warrant." *Collins*, 584 U.S. at 593.

But the Fourth Amendment's warrant requirement "is subject to certain exceptions." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). An "exigent circumstance" such as "the hot pursuit of a fleeing suspect," "the need to prevent the imminent destruction of relevant evidence," and "the need to prevent the escape of a suspect" may constitute such an exception. *Struckman*, 603 F.3d at 743. To rely on the exigent circumstances exception, the government "must satisfy two requirements: first, the government must prove that the officer had probable cause to search," and "second, the government must prove that exigent circumstances justified the warrantless intrusion." *United States v. Johnson*, 256 F.3d 895, 905 (9th Cir. 2001) (en banc) (per curiam). Probable cause exists where "the 'facts and circumstances' before the officer are sufficient to warrant a person of reasonable caution to believe" that a suspect would be found in a place. *Id.* (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)); *see also Newman v. Underhill*, 134 F.4th 1025, 1031 (9th Cir. 2025).

Lieutenant Salkoff and Officer Rose do not dispute that they physically intruded into Plaintiffs' walled-in backyard—Lieutenant Salkoff by entering the yard and Officer Rose by passing Storm over the wall. Such a warrantless search is presumptively unreasonable. *See Collins*, 584 U.S. at 593. The district court assumed, without explanation, that Lieutenant Salkoff and Officer Rose conducted this warrantless search while in hot pursuit of a fleeing suspect. We disagree.

Hot pursuit fundamentally "means some sort of a chase." *United States v. Santana*, 427 U.S. 38, 43 (1976). "The hot

pursuit exception to the warrant requirement only applies when officers are in 'immediate' and 'continuous' pursuit of a suspect from the scene of the crime." *Johnson*, 256 F.3d at 907 (quoting *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984)).  To qualify as hot pursuit, a chase "need not be reminiscent of the opening scene of a James Bond film," *Lange v. California*, 594 U.S. 295, 329 (2021) (Roberts, C.J., concurring).  Officers act with sufficient speed to qualify as hot pursuit when they act immediately, making a "split-second decision" to pursue a suspect. *Stanton v. Sims*, 571 U.S. 3, 10 (2013) (per curiam).

But there is no hot pursuit where "the continuity of the chase was terminated permanently." *Johnson*, 256 F.3d at 908.  In *Johnson*, a suspect "ran into a wooded area where he was free to run for over a half hour" rather than "into a confined area where [the police] could monitor his movements." *Id.*  On that basis, we determined that "the continuity of the chase was clearly broken and a warrant was required." *Id.*  We further noted that, "[a]lthough this requirement may be inconvenient to law enforcement, any other outcome renders the concept of 'hot pursuit' meaningless and allows the police to conduct warrantless searches while investigating a suspect's whereabouts." *Id.*

We recently observed in *Newman* that whether a pursuit's continuity has been broken is a function of "two interrelated considerations."  134 F.4th at 1033.  First, "whether, and to what degree, the officer[] lost track of the suspect's whereabouts." *Id.*  Second, whether, after losing sight of a suspect, the officer "continued to act with speed in attempting to apprehend the suspect." *Id.*  Timing is relevant to both considerations.  As seconds and minutes tick by, the officer's once-clear knowledge of a suspect's position fades till they are no longer chasing a suspect but instead searching

for him. "The more time passes without the officer's physically chasing after the suspect . . . the more likely the continuity of the chase is to break." *Id.*

In *Newman*, officers followed a suspect's truck down a dead-end street where the suspect exited his vehicle and ran directly toward the back of the plaintiff's house. *Id.* at 1028–29. Officers lost sight of the suspect for nine minutes but had probable cause to believe he was in the plaintiff's house, given that the suspect had been headed in that direction, he was not in the backyard, the terrain and fences would have hindered his flight to an adjacent property, the plaintiff's backdoor was unlocked, and the officer perceived someone interacting with the backdoor at some point during the pursuit. *Id.* at 1031. We held that the pursuit's continuity was unbroken because the officers "had a reasonably good idea where [the suspect] was hiding" for the duration of the nine minutes after they lost sight of him. *Id.* at 1033.

Comparatively, here, Officer Rose last saw the suspect fleeing toward a different property—three houses west of Plaintiffs' home—rather than directly to the property that was later searched. Officer Rose neither chased after the person nor peered over the wall to monitor the person's movements, and instead unsuccessfully attempted to cut the suspect off by patrol car. Officers had seen neither hide nor hair of the suspect for at least eighteen minutes preceding their search, in which time the suspect's movements through a suburban neighborhood were completely unknown.

Defendants suggest that they reasonably believed the suspect was somewhere within the neighborhood, and therefore, the continuity of their search was unbroken. If we were to accept this argument, it would threaten to swallow the warrant requirement whole. Officers may not riffle

through private spaces in an entire neighborhood merely because police have lost track of someone who earlier fled from them in the general vicinity. Lieutenant Salkoff and Officer Rose had no "reasonably good" basis for knowing where the suspect was—beyond that he was likely still in the neighborhood. *Id.* at 1033. Therefore, Defendants may not avail themselves of the hot pursuit exception to the Fourth Amendment's warrant requirement.

Defendants urge that Storm's alert salvaged the hot pursuit and gave them probable cause to search Plaintiffs' yard. Not so. Even if the dog sniff did give officers probable cause to believe the suspect was in Plaintiffs' yard, probable cause alone is insufficient to obviate the Fourth Amendment's warrant requirement—there must be both probable cause and an exigent circumstance. *Johnson*, 256 F.3d at 905.

Our case law was clear when these unfortunate events unfolded in February 2019 that a pursuit's continuity is broken when officers lose a suspect's trail, as happened here. We note that *Newman*, decided this year, is not only distinguishable but also does not bear on what was clearly established law in 2019. *See Sanderlin*, 116 F.4th at 916 (noting that "neither favorable nor damning subsequent legal developments can be used to demonstrate what law was or was not clearly established at the time of an officer's challenged conduct"). But *Johnson*, decided in 2001, made it abundantly clear to officers in 2019 that they may not sweep through an area and search the properties within it simply because they believe a suspect is somewhere therein. 256 F.3d at 907–08. Allowing such searches would turn back the clock to the age of English general warrants, which our founders firmly rejected with the inclusion of the Fourth

Amendment. *See Payton v. New York*, 445 U.S. 573, 583 (1980).

Because Defendants lacked an exigent circumstance to search Plaintiffs' yard under clearly established law at the time of the incident, they are not entitled to qualified immunity and summary judgment was improper.

**IV.**

We turn now to the fate of Shadow and Whitewall. "Reasonableness is the touchstone of any seizure under the Fourth Amendment." *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 975 (9th Cir. 2005). "To determine whether the shooting of the dogs was reasonable, we balance 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Id.* (quoting *Graham v. Connor,* 490 U.S. 386, 396 (1989)). We must judge the reasonableness of a particular use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham,* 490 U.S. at 396.

When we evaluate an officer's use of force following a warrantless intrusion into private space, we must not conflate the unreasonable seizure claim with the unreasonable search claim challenging the entry. *County of Los Angeles v. Mendez*, 581 U.S. 420, 428 (2017) ("[T]he objective reasonableness analysis must be conducted separately for each search or seizure that is alleged to be unconstitutional."). Even where officers have violated clearly established law with a warrantless search, we cannot rely on that warrantless search to say that an officer's otherwise reasonable subsequent use of force was excessive. *See id.* at 428–29.

Plaintiffs argue that Lieutenant Salkoff violated rights that were clearly established under *Hells Angels* when he shot their dogs. In *Hells Angels*, recognizing "that dogs are more than just a personal effect," we found that killing dogs is a "severe" intrusion on Fourth Amendment protections. 402 F.3d at 975. But, in that case, officers had a week to plan the execution of the warrants, were aware guard dogs resided at the premises to be searched, and devised only to use a shotgun to handle any encounters with the dogs rather than employing less-intrusive means. *Id.* at 976. We emphasized in our decision that it was not a case "where the officer was reacting to a sudden unexpected situation" or needed to make a split-second judgment. *Id.* at 978.

By contrast, in this case, officers had minutes—not days—to discover and plan for handling any dogs in Plaintiffs' backyard. Lieutenant Salkoff attempted to stir any dogs that might have been home before he entered the yard but saw no indications that dogs were present. Officers were unaware that the resident dogs were pit bulls, as opposed to a breed that may have been less sensitive to the intrusion or more readily controllable by Lieutenant Salkoff. For these reasons, the facts in this case are sufficiently distinguishable from those in *Hells Angels* that we cannot say Lieutenant Salkoff's actions in this more spontaneous confrontation violated clearly established law.

Because Plaintiffs do not offer, and we cannot find, any cases clearly establishing that Lieutenant Salkoff's actions were unreasonable, he is entitled to qualified immunity and summary judgment with respect to his use of force against Plaintiffs' dogs.

We note, however, that Lieutenant Salkoff and Officer Rose may still be liable to Plaintiffs for the deaths of their

dogs as a natural consequence of the warrantless search of their yard. *Tatum v. Moody*, 768 F.3d 806, 817 (9th Cir. 2014) ("Under § 1983, 'a person is responsible for the natural consequences of his actions.'" (simplified)) (quoting *Monroe v. Pape*, 365 U.S. 167, 187 (1961), *overruled in part on other grounds by Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)); *Mendez*, 581 U.S. at 431 (stating that, even where plaintiffs "cannot recover on their excessive force claim, that will not foreclose recovery for injuries proximately caused *by the warrantless entry*").

## V.

Cities may be held liable under § 1983 for constitutional violations committed by their officers. *See Monell*, 436 U.S. at 694. To establish such liability, Plaintiffs must prove "(1) [they were] deprived of a constitutional right; (2) the municipality had a policy; (3) the policy amounted to deliberate indifference to [their] constitutional right; and (4) the policy was the moving force behind the constitutional violation." *Lockett v. County of Los Angeles*, 977 F.3d 737, 741 (9th Cir. 2020). A municipal policy can be, among other things, "a failure to train [or] supervise." *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 603 (9th Cir. 2019).

Plaintiffs contend that the City failed to provide officers with adequate training and supervision regarding warrantless searches and the lawful use of a service weapon on pet dogs. To establish municipal liability under such a theory, the failure to train must "amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (alteration in original) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). Because the municipality must have had "actual or

constructive notice [of] a particular omission in their training program" to demonstrate deliberate indifference, a plaintiff must typically provide evidence of "[a] pattern of similar constitutional violations by untrained employees." *Id.* at 61–62.

Plaintiffs' *Monell* claim on warrantless searches fails because Plaintiffs have not offered any evidence of a pattern of warrantless search violations or other evidence of constructive notice such that the City was deliberately indifferent to Plaintiffs' Fourth Amendment rights. As for the use-of-force claim, Plaintiffs note that the City settled three prior suits involving dog-shootings, each with different facts than those presented here, during a five-year period. Even if those settlements suggest that the police may have acted wrongfully in those cases, evidence of "sporadic" or "isolated" wrongdoing is generally insufficient to establish "that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996); *see also Connick*, 563 U.S. at 62–63. Therefore, the City is entitled to summary judgment on Plaintiffs' *Monell* claims.[2]

## VI.

We reverse the district court's grant of qualified immunity and summary judgment to Lieutenant Salkoff and Officer Rose with respect to their search of Plaintiffs' backyard. Because the district court declined to exercise supplemental jurisdiction over Plaintiffs' state law claim solely based on its grant of summary judgment to

---

[2] Plaintiffs also do not argue that the consequences of a failure to train on warrantless searches are so "patently obvious" that the City could be liable "without proof of a pre-existing pattern of violations." *Connick*, 563 U.S. at 64.

Defendants on all of Plaintiffs' federal claims, its dismissal of that claim is also reversed. *See Brodheim v. Cry*, 584 F.3d 1262, 1273 (9th Cir. 2009). We affirm the district court's grant of summary judgment in all other respects. We remand for further proceedings.

The parties shall bear their own costs on appeal.

**AFFIRMED IN PART; REVERSED IN PART; REMANDED.**