**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| GENOA JONES; CORNELL TINSLEY, | No. 24-3374 |
| *Plaintiffs - Appellants*, | D.C. No. 2:21-cv-00241-CDS-DJA |
| v. | |
| CITY OF NORTH LAS VEGAS; SCOTT SALKOFF; MICHAEL ROSE, | ORDER AND AMENDED OPINION |
| *Defendants - Appellees*. | |

Appeal from the United States District Court
for the District of Nevada
Cristina D. Silva, District Judge, Presiding

Argued and Submitted May 22, 2025
San Francisco, California

Filed September 8, 2025
Amended March 6, 2026

Before: Michelle T. Friedland and Salvador Mendoza, Jr.,
Circuit Judges, and Robert S. Lasnik, District Judge.[*]

---

[*] The Honorable Robert S. Lasnik, United States District Judge for the
Western District of Washington, sitting by designation.

Order;
Opinion by Judge Mendoza;
Dissent from Order by Judge Collins

## SUMMARY[**]

### Fourth and Fourteenth Amendments

The panel filed (1) an order amending the opinion filed on September 8, 2025, and denying rehearing en banc; and (2) an amended opinion affirming in part and reversing in part the district court's summary judgment in favor of the City of North Las Vegas and two police officers in plaintiffs' action alleging that defendants violated their Fourth and Fourteenth Amendment rights when the officers physically intruded into plaintiffs' backyard without permission while searching for a suspect, and one of the officers shot and killed two of plaintiffs' dogs after the dogs attacked the police K-9.

The panel reversed the district court's grant of qualified immunity and summary judgment to the individual police officers with respect to their search of plaintiffs' backyard. Relying on *United States v. Johnson*, 256 F.3d 895 (9th Cir. 2001) (en banc) (per curiam), the panel held that defendants could not avail themselves of the "hot pursuit" exception to the Fourth Amendment's warrant requirement, which only applies when officers are in "immediate" and "continuous" pursuit of a suspect from the

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

scene of the crime. Here, the continuity of the pursuit was broken when defendants lost track of the suspect's whereabouts for at least eighteen minutes. Because defendants lacked an exigent circumstance to search plaintiffs' yard under clearly established law at the time of the incident, they were not entitled to qualified immunity.

The panel reversed the district court's dismissal of plaintiffs' state law claim because the district court declined to exercise supplemental jurisdiction over the claim solely based on its grant of summary judgment to defendants on all of plaintiffs' federal claims.

The panel affirmed the district court's summary judgment for Lieutenant Salkoff, holding that he was entitled to qualified immunity with respect to his use of force against plaintiffs' dogs because, given the spontaneous confrontation, the panel could not say that he violated clearly established law.

The panel affirmed the district court's summary judgment on plaintiffs' *Monell* claims pertaining to both the warrantless search and use-of-force claims. Plaintiffs offered no evidence of a pattern of warrantless search violations or other evidence establishing that the City was deliberately indifferent to plaintiffs' Fourth Amendment rights or that its conduct had become a traditional method for carrying out policy.

The panel remanded for further proceedings.

Dissenting from the denial of rehearing en banc, Judge Collins, joined by Judges Callahan, Bennett, R. Nelson, Lee, Bress, Bumatay, and Tung, wrote that by holding that *Johnson* clearly established the relevant law, the panel relied on an overbroad reading of precedent and thereby

disregarded the Supreme Court's repeated admonition that courts must not define clearly established law at a high level of generality. Judge Collins also wrote that the new footnote added to the panel's amended opinion introduced further error by explicitly reaffirming *Johnson*'s overbroad comment that a fleeing suspect's commission of a "misdemeanor" "weighs heavily against" a finding of exigent circumstances because that sweeping comment did not survive the Supreme Court's decision in *Lange v. California*, 594 U.S. 295 (2021), and also cannot be squared with *Stanton v. Sims*, 571 U.S. 3 (2013).

## COUNSEL

Margaret A. McLetchie (argued) and Leo S. Wolpert, McLetchie Law, Las Vegas, Nevada; Jennifer L. Braster, Naylor & Braster, Las Vegas, Nevada; for Plaintiffs-Appellants.

Rhiann J. Denman (argued), Chief Deputy City Attorney; Noel E. Eidsmore, Assistant City Attorney; Micaela R. Moore, Former City Attorney; Andrew D. Moore, City Attorney; North Las Vegas Office of the City Attorney, North Las Vegas, Nevada; for Defendants-Appellees.

## ORDER

The opinion filed September 8, 2025, is hereby amended. The amended opinion will be filed concurrently with this order.

Judges Friedland and Mendoza voted to deny the petition for rehearing en banc, and Judge Lasnik so recommended. The full court was advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed. R. App. P. 40.

The petition for rehearing en banc (Dkt. No. 46) is **DENIED**, and no further petitions for rehearing will be entertained.

## OPINION

MENDOZA, Circuit Judge:

When does a hot pursuit turn cold? Today we conclude that a pursuit was at best lukewarm, and certainly no longer hot pursuit, when officers lost a suspect's trail in a residential neighborhood for at least eighteen minutes.

A police officer saw a suspect flee from the back of a house into a neighboring backyard. Instead of directly following the suspect, the officer hurried to his car, called for backup, and drove two blocks south to establish a perimeter around the area. At least eighteen minutes passed before a K-9 unit alerted in the direction of Plaintiffs' backyard, several houses away from where the suspect had

disappeared.  An officer with a K-9 searched the yard, rousing Plaintiffs' three dogs.  Two of the dogs attacked the police K-9 and were shot and killed by an officer.

Plaintiffs Genoa Jones and Cornell Tinsley sued under 42 U.S.C. § 1983, claiming the officers and the City of North Las Vegas violated their Fourth Amendment right to be free from unwarranted searches and seizures.  The district court granted summary judgment for the officers, reasoning that the officers' intrusion was permitted by the hot pursuit exception to the warrant requirement and that the use of force was reasonable under the circumstances.  The district court also granted summary judgment for the city, finding no support for Plaintiffs' failure-to-train theory.

We reverse, in part, holding that there was no hot pursuit where officers lost track of a suspect for at least eighteen minutes.  We affirm with respect to the K-9 handler's use of force and the claims against the city.  We remand for further proceedings.

## I.

On February 15, 2019, at 3:47 p.m., North Las Vegas Police Department ("NLVPD") Officers Joseph Minelli ("Officer Minelli") and Michael Rose ("Officer Rose") responded to a possible domestic battery at a house on a residential cul-de-sac.  While Officer Minelli spoke with a woman at the door, Officer Rose moved to the side of the house, where he witnessed a person flee over the back wall to the south into a neighboring yard.  Officer Rose ran to his patrol car to request assistance.  He drove two streets south hoping to cut off whomever had fled but did not catch sight of the person again.  Several units quickly responded and helped Officer Rose establish a multiple-block perimeter around the area.

Meanwhile, Officer Minelli stayed at the home to investigate the domestic battery allegation. The woman who answered the door denied that there was any domestic violence, but Officer Minelli observed injuries on her face, including several injuries around her eyes and a long cut across her chin that had been stitched. The woman told Officer Minelli that police were not welcome at her house and that her boyfriend—whom officers suspected had battered the woman and whom they believed to be the person who fled—would be back that evening and police would need a warrant to apprehend him at the home. Officer Minelli remained at the address in case the suspect returned.

With a perimeter in place, officers believed nobody could leave the area without crossing their line of sight. A sergeant on scene decided to call for a K-9 unit to search for the suspect. NLVPD Lieutenant Scott Salkoff ("Lieutenant Salkoff") and his police K-9 Storm ("Storm") responded to the scene around 4:05 p.m., approximately eighteen minutes after Officer Rose saw the suspect flee.

Lieutenant Salkoff used Storm—who is trained to detect the odor of apocrine, a hormone some people release when they are afraid—to search within the perimeter. Lieutenant Salkoff informed residents of the searches using his patrol car's public address system. He also sent NLVPD Officer Lee Young ("Officer Young") ahead to seek consent from residents to search their yards.

Lieutenant Salkoff was searching a backyard four houses east and one house south of where the suspect vanished when

Storm alerted to an odor coming from a distant, elevated position in the direction of Plaintiffs' walled-in backyard.[1]

Lieutenant Salkoff decided to search Plaintiffs' backyard.  He had Officer Young check the gate, which was locked and posted with a "Beware of Dog" sign.  Officer Young knocked on Plaintiffs' door to request their consent to search the yard but received no response because they were not home.  To gain a vantage, Lieutenant Salkoff jumped onto the six-foot cinderblock wall that enclosed Plaintiffs' yard.  He observed trash cans, where he thought the suspect might be hiding, and a fenced-in kennel area with an open gate and three dog houses and bowls but did not see any dogs.

With neither a warrant nor Plaintiffs' consent, Lieutenant Salkoff hopped down from the wall into their backyard.  Officer Rose then passed Storm over the wall.  Plaintiffs' three dogs were stirred from their doghouses, emerging to investigate the unwelcome strangers in their yard.  Lieutenant Salkoff attempted to keep the dogs at bay, kicking them and placing trash cans between them and Storm.  His efforts deterred one dog, but the other two—Shadow and Whitewall—attacked Storm.  Lieutenant Salkoff drew his service weapon and killed both Shadow and Whitewall.

---

[1] We know Storm's alert came at least eighteen minutes after officers had last seen the person they were looking for—and, on the record before us, it may have been much later.  Officer Rose saw someone flee at around 3:47 p.m. and Lieutenant Salkoff responded to the scene with Storm at approximately 4:05 p.m.  Lieutenant Salkoff does not recall precisely when or where he started his search and says he may have searched one yard or more than a dozen yards before Storm smelled fear in the air.  Officer Rose recalls that the search lasted for more than an hour and possibly for two or three hours.

Despite officers scouring the neighborhood, they never found the person they were looking for.

Plaintiffs sued Lieutenant Salkoff, Officer Rose, and the City of North Las Vegas ("the City"), asserting several claims under 42 U.S.C. § 1983: Lieutenant Salkoff violated the Fourth and Fourteenth Amendments when, without a warrant, he entered Plaintiffs' backyard, and Officer Rose violated the same when he passed Storm into the yard; Lieutenant Salkoff violated the Fourth and Fourteenth Amendments when he unreasonably seized their dogs by shooting them dead; and the City was deliberately indifferent to the risk of these violations. Plaintiffs also brought a state law claim that Lieutenant Salkoff and the City violated Nevada Revised Statutes § 41.130.

The district court granted Defendants' motion for summary judgment on the constitutional claims, declined to exercise supplemental jurisdiction over the remaining state law claim, and entered judgment for Defendants. Plaintiffs timely appeal.

## II.

We review a district court's grant of summary judgment de novo, *Spencer v. Pew*, 117 F.4th 1130, 1137 (9th Cir. 2024), including officers' entitlement to qualified immunity, *Sanderlin v. Dwyer*, 116 F.4th 905, 910 (9th Cir. 2024). In conducting this review, we take "the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Nehad v. Browder*, 929 F.3d 1125, 1132 (9th Cir. 2019); Fed. R. Civ. P. 56(e).

Qualified immunity protects government officials from liability under § 1983 "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of

their conduct was clearly established at the time." *Waid v. County of Lyon*, 87 F.4th 383, 387 (9th Cir. 2023) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018)). "Either prong can be adjudicated on appeal by taking the facts as most favorable to the plaintiffs and applying the pertinent legal standards to those facts." *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 945 (9th Cir. 2017). Defendants are entitled to qualified immunity where we find "a negative answer at either step." *Sabbe v. Wash. Cnty. Bd. of Comm'rs*, 84 F.4th 807, 819 (9th Cir. 2023).

## III.

"When a law enforcement officer physically intrudes on the curtilage" of a home, like a walled-in backyard, "a search within the meaning of the Fourth Amendment has occurred." *Collins v. Virginia*, 584 U.S. 586, 593 (2018). "[A] small, enclosed yard adjacent to a home in a residential neighborhood . . . is 'curtilage' subject to Fourth Amendment protection." *United States v. Struckman*, 603 F.3d 731, 739 (9th Cir. 2010) (quoting *United States v. Romero-Bustamente*, 337 F.3d 1104, 1108 (9th Cir. 2003)). Such searches are "presumptively unreasonable absent a warrant." *Collins*, 584 U.S. at 593.

But the Fourth Amendment's warrant requirement "is subject to certain exceptions." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). An "exigent circumstance" such as "the hot pursuit of a fleeing suspect," "the need to prevent the imminent destruction of relevant evidence," and "the need to prevent the escape of a suspect" may constitute such an exception. *Struckman*, 603 F.3d at 743. To rely on the exigent circumstances exception, the government "must satisfy two requirements: first, the government must prove that the officer had probable cause to search," and "second,

the government must prove that exigent circumstances justified the warrantless intrusion." *United States v. Johnson*, 256 F.3d 895, 905 (9th Cir. 2001) (en banc) (per curiam). Probable cause exists where "the 'facts and circumstances' before the officer are sufficient to warrant a person of reasonable caution to believe" that a suspect would be found in a place. *Id.* (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)); *see also Newman v. Underhill*, 134 F.4th 1025, 1031 (9th Cir. 2025).

Lieutenant Salkoff and Officer Rose do not dispute that they physically intruded into Plaintiffs' walled-in backyard—Lieutenant Salkoff by entering the yard and Officer Rose by passing Storm over the wall. Such a warrantless search is presumptively unreasonable. *See Collins*, 584 U.S. at 593. The district court assumed, without explanation, that Lieutenant Salkoff and Officer Rose conducted this warrantless search while in hot pursuit of a fleeing suspect. We disagree.

Hot pursuit fundamentally "means some sort of a chase." *United States v. Santana*, 427 U.S. 38, 43 (1976). To qualify as hot pursuit, a chase "need not be reminiscent of the opening scene of a James Bond film." *Lange v. California*, 594 U.S. 295, 329 (2021) (Roberts, C.J., concurring). "The hot pursuit exception to the warrant requirement only applies when officers are in 'immediate' and 'continuous' pursuit of a suspect from the scene of the crime." *Johnson*, 256 F.3d at 907 (quoting *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984)). As to immediacy, officers act with sufficient speed to qualify as hot pursuit when they act immediately, making a "split-second decision" to pursue a suspect. *Stanton v. Sims*, 571 U.S. 3, 10 (2013) (per curiam).

But there is no hot pursuit where "the continuity of the chase [has been] terminated" definitively.  *Johnson*, 256 F.3d at 908.  In *Johnson*, a suspect "ran into a wooded area where he was free to run for over a half hour" rather than "into a confined area where [the police] could monitor his movements."  *Id.*  On that basis, we determined that "the continuity of the chase was clearly broken and a warrant was required."  *Id.*  We further noted that, "[a]lthough this requirement may be inconvenient to law enforcement, any other outcome renders the concept of 'hot pursuit' meaningless and allows the police to conduct warrantless searches while investigating a suspect's whereabouts."  *Id.*

We recently observed in *Newman* that whether a pursuit's continuity has been definitively broken is a function of "two interrelated considerations."  134 F.4th at 1033.  First, "whether, and to what degree, the officer[] lost track of the suspect's whereabouts."  *Id.*  Second, whether, after losing sight of a suspect, the officer "continued to act with speed in attempting to apprehend the suspect."  *Id.*  Timing is relevant to both considerations.  As seconds and minutes tick by, the officer's once-clear knowledge of a suspect's position fades till they are no longer chasing a suspect but instead searching for him.  "The more time passes without the officer's physically chasing after the suspect . . . the more likely the continuity of the chase is to break."  *Id.*

In *Newman*, officers followed a suspect's truck down a dead-end street where the suspect exited his vehicle and ran directly toward the back of the plaintiff's house.  *Id.* at 1028–29.  Officers lost sight of the suspect for nine minutes but had probable cause to believe he was in the plaintiff's house, given that the suspect had been headed in that direction, he was not in the backyard, the terrain and fences would have

hindered his flight to an adjacent property, the plaintiff's backdoor was unlocked, and the officer perceived someone interacting with the backdoor at some point during the pursuit. *Id.* at 1031. We held that the pursuit's continuity was unbroken because the officers "had a reasonably good idea where [the suspect] was hiding" for the duration of the nine minutes after they lost sight of him. *Id.* at 1033.

Comparatively, here, Officer Rose last saw the suspect fleeing toward a different property—three houses west of Plaintiffs' home—rather than directly to the property that was later searched. Officer Rose neither chased after the person nor peered over the wall to monitor the person's movements, and instead unsuccessfully attempted to cut the suspect off by patrol car. Officers had seen neither hide nor hair of the suspect for at least eighteen minutes preceding their search, in which time the suspect's movements through a suburban neighborhood were completely unknown. In light of those circumstances, the continuity of the chase here was broken, so the hot pursuit exception no longer applied.[2]

---

[2] We note that exigent circumstances are less likely to exist when the alleged offense is a misdemeanor and there is no risk of "imminent harm to others." *Lange v. California*, 594 U.S. 295, 308 (2021); *see also id.* at 313 ("The flight of a suspected misdemeanant does not always justify a warrantless entry into a home. An officer must consider all the circumstances in a pursuit case to determine whether there is a law enforcement emergency."); *Johnson*, 256 F.3d at 908 ("[A]pplication of the exigent circumstances exception in the context of a home entry should rarely be sanctioned when there is probable cause to believe that only a minor offense . . . has been committed." (quoting *Welsh v. Wisconsin,* 466 U.S. 740, 753 (1984))). In this case, the gravity of the alleged offense and the lack of risk of imminent harm to others weigh against applying the exigent circumstances exception. *Johnson*, 256 F.3d at 908 (explaining that the allegation that the suspect committed only a misdemeanor "does not definitely preclude a finding of exigent

Defendants suggest that they reasonably believed the suspect was somewhere within the neighborhood, and therefore, the continuity of their search was unbroken. If we were to accept this argument, it would threaten to swallow the warrant requirement whole. Officers may not riffle through private spaces in an entire neighborhood merely because police have lost track of someone who earlier fled from them in the general vicinity. Lieutenant Salkoff and Officer Rose had no "reasonably good" basis for knowing where the suspect was—beyond that he was likely still in the neighborhood. *Id.* at 1033. Therefore, Defendants may not avail themselves of the hot pursuit exception to the Fourth Amendment's warrant requirement.

Defendants urge that Storm's alert salvaged the hot pursuit and gave them probable cause to search Plaintiffs' yard. Not so. Even assuming the dog alert did give the officers probable cause to believe the suspect was in Plaintiffs' yard, by that time, "the continuity of the chase was terminated" so there was no hot pursuit to salvage. *Johnson*, 256 F.3d at 908.

Our case law was clear when these unfortunate events unfolded in February 2019 that a pursuit's continuity is broken when officers completely lose a suspect's trail for more than a short time, as happened here. We note that *Newman*, decided this year, is not only distinguishable but

---

circumstances, it weighs heavily against it"). Defendants conceded that the suspect was alleged to have committed a misdemeanor, domestic battery. Although the Supreme Court has recognized that domestic violence is a serious misdemeanor, *Lange*, 594 U.S. at 308, the danger involved is generally to co-habitants. Here, one officer remained at the victim's address in case the suspect returned, thereby ensuring that neither she nor any other member of the household was at risk of imminent harm.

also does not bear on what was clearly established law in 2019. *See Sanderlin*, 116 F.4th at 916 (noting that "neither favorable nor damning subsequent legal developments can be used to demonstrate what law was or was not clearly established at the time of an officer's challenged conduct"). But *Johnson*, decided in 2001, made it clear to officers in 2019 that they may not sweep through an area and search the properties within it simply because they believe a suspect is somewhere therein. 256 F.3d at 907–08. Allowing such searches would turn back the clock to the age of English general warrants, which our founders firmly rejected with the inclusion of the Fourth Amendment. *See Payton v. New York*, 445 U.S. 573, 583 (1980).

Because Defendants lacked an exigent circumstance to search Plaintiffs' yard under clearly established law at the time of the incident, they are not entitled to qualified immunity and summary judgment was improper.

## IV.

We turn now to the fate of Shadow and Whitewall. "Reasonableness is the touchstone of any seizure under the Fourth Amendment." *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 975 (9th Cir. 2005). "To determine whether the shooting of the dogs was reasonable, we balance 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Id.* (quoting *Graham v. Connor,* 490 U.S. 386, 396 (1989)). We must judge the reasonableness of a particular use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham,* 490 U.S. at 396.

When we evaluate an officer's use of force following a warrantless intrusion into private space, we must not conflate the unreasonable seizure claim with the unreasonable search claim challenging the entry. *County of Los Angeles v. Mendez*, 581 U.S. 420, 428 (2017) ("[T]he objective reasonableness analysis must be conducted separately for each search or seizure that is alleged to be unconstitutional."). Even where officers have violated clearly established law with a warrantless search, we cannot rely on that warrantless search to say that an officer's otherwise reasonable subsequent use of force was excessive. *See id.* at 428–29.

Plaintiffs argue that Lieutenant Salkoff violated rights that were clearly established under *Hells Angels* when he shot their dogs. In *Hells Angels*, recognizing "that dogs are more than just a personal effect," we found that killing dogs is a "severe" intrusion on Fourth Amendment protections. 402 F.3d at 975. But, in that case, officers had a week to plan the execution of the warrants, were aware guard dogs resided at the premises to be searched, and devised only to use a shotgun to handle any encounters with the dogs rather than employing less-intrusive means. *Id.* at 976. We emphasized in our decision that it was not a case "where the officer was reacting to a sudden unexpected situation" or needed to make a split-second judgment. *Id.* at 978.

By contrast, in this case, officers had minutes—not days—to discover and plan for handling any dogs in Plaintiffs' backyard. Lieutenant Salkoff attempted to stir any dogs that might have been home before he entered the yard but saw no indications that dogs were present. Officers were unaware that the resident dogs were pit bulls, as opposed to a breed that may have been less sensitive to the intrusion or more readily controllable by Lieutenant Salkoff.

For these reasons, the facts in this case are sufficiently distinguishable from those in *Hells Angels* that we cannot say Lieutenant Salkoff's actions in this more spontaneous confrontation violated clearly established law.

Because Plaintiffs do not offer, and we cannot find, any cases clearly establishing that Lieutenant Salkoff's actions were unreasonable, he is entitled to qualified immunity and summary judgment with respect to his use of force against Plaintiffs' dogs.

We note, however, that Lieutenant Salkoff and Officer Rose may still be liable to Plaintiffs for the deaths of their dogs as a natural consequence of the warrantless search of their yard. *Tatum v. Moody*, 768 F.3d 806, 817 (9th Cir. 2014) ("Under § 1983, 'a person is responsible for the natural consequences of his actions.'" (simplified)) (quoting *Monroe v. Pape*, 365 U.S. 167, 187 (1961), *overruled in part on other grounds by Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)); *Mendez*, 581 U.S. at 431 (stating that, even where plaintiffs "cannot recover on their excessive force claim, that will not foreclose recovery for injuries proximately caused *by the warrantless entry*").

## V.

Cities may be held liable under § 1983 for constitutional violations committed by their officers. *See Monell*, 436 U.S. at 694. To establish such liability, Plaintiffs must prove "(1) [they were] deprived of a constitutional right; (2) the municipality had a policy; (3) the policy amounted to deliberate indifference to [their] constitutional right; and (4) the policy was the moving force behind the constitutional violation." *Lockett v. County of Los Angeles*, 977 F.3d 737, 741 (9th Cir. 2020). A municipal policy can be, among other

things, "a failure to train [or] supervise." *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 603 (9th Cir. 2019).

Plaintiffs contend that the City failed to provide officers with adequate training and supervision regarding warrantless searches and the lawful use of a service weapon on pet dogs. To establish municipal liability under such a theory, the failure to train must "amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (alteration in original) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). Because the municipality must have had "actual or constructive notice [of] a particular omission in their training program" to demonstrate deliberate indifference, a plaintiff must typically provide evidence of "[a] pattern of similar constitutional violations by untrained employees." *Id.* at 61–62.

Plaintiffs' *Monell* claim on warrantless searches fails because Plaintiffs have not offered any evidence of a pattern of warrantless search violations or other evidence of constructive notice such that the City was deliberately indifferent to Plaintiffs' Fourth Amendment rights. As for the use-of-force claim, Plaintiffs note that the City settled three prior suits involving dog-shootings, each with different facts than those presented here, during a five-year period. Even if those settlements suggest that the police may have acted wrongfully in those cases, evidence of "sporadic" or "isolated" wrongdoing is generally insufficient to establish "that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996); *see also Connick*, 563 U.S. at 62–63. Therefore,

the City is entitled to summary judgment on Plaintiffs' *Monell* claims.[3]

## VI.

We reverse the district court's grant of qualified immunity and summary judgment to Lieutenant Salkoff and Officer Rose with respect to their search of Plaintiffs' backyard.  Because the district court declined to exercise supplemental jurisdiction over Plaintiffs' state law claim solely based on its grant of summary judgment to Defendants on all of Plaintiffs' federal claims, its dismissal of that claim is also reversed.  *See Brodheim v. Cry*, 584 F.3d 1262, 1273 (9th Cir. 2009).  We affirm the district court's grant of summary judgment in all other respects.  We remand for further proceedings.

The parties shall bear their own costs on appeal.

**AFFIRMED IN PART; REVERSED IN PART; REMANDED.**

---

[3] Plaintiffs also do not argue that the consequences of a failure to train on warrantless searches are so "patently obvious" that the City could be liable "without proof of a pre-existing pattern of violations."  *Connick*, 563 U.S. at 64.

COLLINS, Circuit Judge, with whom CALLAHAN, BENNETT, R. NELSON, LEE, BRESS, BUMATAY, and TUNG, Circuit Judges, join, dissenting from the denial of rehearing en banc:

This case is another in a long—and seemingly unending—string of cases in which our court continues to ignore controlling Supreme Court precedent concerning qualified immunity in actions brought under 42 U.S.C. § 1983. As the Court has reiterated, "officers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was *clearly established at the time*." *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018) (emphasis added) (simplified). "A right is clearly established when it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (simplified). Time and again, however, we have evaded this demanding standard for defeating qualified immunity by defining "clearly established" law in broad and general terms that disregard the legal and factual nuances of the particular situation that the officers faced. We have done so despite the Supreme Court's having "repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (simplified). The panel's decision in this case is a particularly egregious example of our stubborn adherence to this oft-condemned practice.

The underlying Fourth Amendment claim in this case presents the important and interesting question whether the "hot pursuit" of a suspect will justify a warrantless entry into

a property if the pursuing police officers temporarily lose the suspect's trail but then believe that they have recovered it. Specifically, the panel held that where police officers are engaged in continuous efforts to pursue a fleeing dangerous suspect but then "lose [the] suspect's trail," the continuity of any "hot pursuit" is *irretrievably* broken for purposes of the warrant exception for the "exigent circumstance" of a pursuit, and that the continuity *remains* broken even if the trail is only temporarily lost and is promptly recovered (here, within about 18 minutes). *Jones v. City of North Las Vegas*, 150 F.4th 1030, 1037 (9th Cir. 2025); *see also Jones*, Amended Opin. at 14.  Despite the fact that, at the time of the Defendant Officers' entry into Plaintiffs' property in this case, no Supreme Court or Ninth Circuit decision had ever squarely addressed this sort of recovery-of-a-hot-pursuit scenario, the panel summarily announced that its (dubious) answer to that novel question had actually been the clearly established law of this court for nearly a quarter of a century. The panel did so by improperly over-generalizing the principles established in a "materially distinguishable" 2001 Ninth Circuit decision that "does not govern the facts of this case" and that did not put the Defendant Officers "on notice that [their] specific conduct was unlawful." *Rivas-Villegas*, 595 U.S. at 6.  Indeed, that sole 2001 decision invoked by the panel here—*United States v. Johnson*, 256 F.3d 895 (9th Cir. 2001) (en banc)—did not even address, much less resolve, whether a trail that is temporarily lost can promptly be recovered.  It should go without saying that a precedent cannot "clearly establish" the answer to a question that was not even presented or considered in that case.

We should have granted rehearing en banc to address the panel's troubling disregard of Supreme Court precedent

concerning the application of qualified immunity. I respectfully dissent from our failure to do so.

# I

## A

Around 3:47 p.m. on February 15, 2019, two officers from the North Las Vegas Police Department ("NLVPD"), Officer Minelli and Officer Rose, responded to a welfare check request regarding a possible domestic battery incident at a specific address, which was a house on a residential cul-de-sac. The person making the report had received texts of photographs from her sister showing various injuries to her face. The person reporting told the dispatch that her sister's boyfriend, Demario Shapiro, had battered her sister before and that "she was scared for her sister's safety." Upon arriving at the residence to conduct a welfare check, Officer Minelli recalled that he had personally responded to the very same house in the past for a domestic-related incident.

The officers rang the doorbell, and in response, the front door opened slightly and then was immediately closed. Officer Minelli attempted to open the door, but it was locked. He knocked on the door shouting "Police," and a few moments later, a woman responded. Officer Minelli thought that she was stalling, but she finally stepped outside after he asked her several times to come out.

Meanwhile, Officer Rose positioned himself so that he could view the side of the house in case anyone fled the scene. Officer Rose then witnessed a man—who the officers suspected was Shapiro—fleeing from the back of the house, running southbound, and jumping over the wall into the neighboring yard. In response, Officer Rose quickly got in his patrol car and drove two streets to the south in an

unsuccessful attempt to cut off the fleeing suspect. Believing that the suspect was hiding out in the immediate vicinity, Officer Rose promptly requested assistance, and several nearby units responded and "very quickly" established a multi-block perimeter to contain the suspect. The officers took up spots around the perimeter such that they believed the suspect would not be able to get out without crossing their line of sight.  Believing that the suspect was a "dangerous offender" who not only put the alleged victim at risk but also "anybody else he comes in contact with in the neighborhood," the officers made announcements over their public address systems that were audible throughout the neighborhood, and they began knocking on doors to make contact with the residents.

While the perimeter was being set up, Officer Minelli stayed behind to talk with the woman regarding the domestic battery allegations.  He observed that she had several severe injuries on her face, including a long, stitched cut across her chin.  Officer Minelli broadcasted this information over the radio to the other responding officers.  The woman, however, was uncooperative and relayed inconsistent narratives regarding Shapiro's location and her injuries.  She denied any allegations of domestic violence and told Officer Minelli that Shapiro would be back home later that evening, that the police were not welcome at her house, and that they would need to obtain a warrant to apprehend Shapiro.

Among those who responded and aided in the search for the suspect was a K-9 unit consisting of NLVPD Lieutenant Salkoff and his police dog, "Storm."  They arrived at the scene around 4:05 PM, approximately 18 minutes after Officers Minelli and Rose had arrived at the victim's home. Prior to deploying the police dog, Lieutenant Salkoff conducted a records check of Shapiro, which revealed that

Shapiro had an active domestic battery misdemeanor warrant and an active traffic warrant, as well as an extensive criminal history that included 11 prior arrests for domestic battery with strangulation, obstruction, robbery, assault with a deadly weapon, battery with substantial bodily harm, carrying a concealed weapon, possession of a stolen vehicle, and traffic charges.

After making announcements about the use of a police dog from his vehicle's public address system, Lieutenant Salkoff took Storm and began to search for the suspect within the perimeter. Lieutenant Salkoff searched a property that was located about one house south and four houses east of the victim's home, when Storm—who was trained to detect apocrine, an odor that humans release when they are scared—gave an indication of "high alert" from the direction of Plaintiffs' walled-in backyard. NLVPD Officer Young, who had been sent ahead by Lieutenant Salkoff to seek consent from residents to search their yards, attempted to make contact with someone in Plaintiffs' home, but no one responded. Officer Young went to check the gate, and it was locked. He also noticed a "Beware of Dog" sign, and he relayed that fact to Lieutenant Salkoff. Lieutenant Salkoff also observed three doghouses enclosed by a chain-link fence with an open gate. The officers whistled, shook the locked gate, and slapped the wall to determine if any dogs were in the yard, but they did not observe any signs of movement or animals. Lieutenant Salkoff then decided to jump the wall into Plaintiffs' backyard, and Officer Rose lifted Storm and handed him to Lieutenant Salkoff over the wall. Lieutenant Salkoff and Storm began searching Plaintiffs' yard when Plaintiffs' three pit bulls emerged from their doghouses. Two of the dogs started to attack Storm, and after failing to keep the dogs at bay through non-lethal

means, Lieutenant Salkoff drew his department-issued firearm and shot the two dogs, killing them. Despite the search, the officers never found the suspect.

Plaintiffs sued Lieutenant Salkoff, Officer Rose, and the City of North Las Vegas (collectively "Defendants"). Invoking 42 U.S.C. § 1983, Plaintiffs asserted two Fourth Amendment claims against Lieutenant Salkoff and Officer Rose ("Defendant Officers"), one for unreasonable search of their property and one for unreasonable seizure of their dogs. Plaintiffs also asserted a *Monell* claim against the City of North Las Vegas ("City") based on the theory that the City had failed to adequately train and supervise its officers. Plaintiffs also asserted a state law claim under Nevada law.

The district court granted the Defendant Officers qualified immunity, granted summary judgment in favor of Defendants on all federal claims, and declined to exercise supplemental jurisdiction over the remaining state law claim. Plaintiffs timely appealed.

## B

As relevant here, the panel reversed the grant of summary to the Defendant Officers with respect to Plaintiffs' claim that they had violated the Fourth Amendment by entering and searching Plaintiffs' backyard. *Jones*, Amended Opin. at 6.[1] As the panel acknowledged, *see id*. at 9–10, the qualified immunity inquiry involves "a two-pronged inquiry": (1) the first prong asks whether "the

---

[1] The panel affirmed the district court's grant of qualified immunity to the Defendant Officers with respect to Plaintiffs' separate Fourth Amendment claim concerning the seizure of the two dogs, as well as the district court's grant of summary judgment to the City as to Plaintiffs' *Monell* claim. *Jones*, Amended Opin. at 15–19. I do not question either of those rulings.

officer's conduct violated a federal right," and (2) the "second prong . . . asks whether the right in question was clearly established at the time of the violation," *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014) (simplified). The panel held that Plaintiffs had established both prongs, thereby defeating qualified immunity. *Jones*, Amended Opin. at 14–15.

As to the first prong, the panel acknowledged that the warrantless entry into Plaintiffs' backyard would be reasonable if (1) it was supported by probable cause, and (2) "exigent circumstances justified the warrantless intrusion." *Jones*, Amended Opin. at 10–11 (citation omitted). The panel assumed, without deciding, that Storm's alert "*did* give the officers probable cause to believe the suspect was in Plaintiffs' yard." *Id*. at 14 (emphasis added). But the panel held that the search was nonetheless invalid because there were no "exigent circumstances" to justify the warrantless intrusion. *Id*. at 11–14. Specifically, the panel rejected the Defendant Officers' contention that exigent circumstances were present in that they were "in hot pursuit of a fleeing suspect." *Id*. at 11.

The panel held that, under the en banc decision in *United States v. Johnson*, 256 F.3d 895 (9th Cir. 2001), "[t]he hot pursuit exception to the warrant requirement only applies when officers are in 'immediate' and 'continuous' pursuit of a suspect from the scene of the crime." *Jones*, Amended Opin. at 11 (quoting *Johnson*, 256 F.3d at 907). The panel held that the Defendant Officers responded to the suspect's flight from the victim's home with sufficient alacrity to count as acting "immediately." *Id*. But the panel concluded that the "continuity" requirement was not met because, in its view, the Defendant "Officers had seen neither hide nor hair of the suspect for at least eighteen minutes preceding their

search [of Plaintiffs' backyard], in which time the suspect's movements through a suburban neighborhood were completely unknown." *Id*. at 13. The panel held that the fact that the Defendant Officers knew that the suspect was "somewhere within the neighborhood" was not enough, because that information was too non-specific and would justify searching "through private spaces in an entire neighborhood." *Id*. at 14. In response to the Defendants Officers' argument that "Storm's alert salvaged the hot pursuit and gave them probable cause to search Plaintiffs' yard," the panel held that there was no exigent circumstance to justify the warrantless entry because "'the continuity of the chase was terminated' so there was no hot pursuit to salvage." *Id*. (quoting *Johnson*, 256 F.3d at 908).

Turning to the second prong of the qualified immunity inquiry, the panel held that "[o]ur case law was clear when these unfortunate events unfolded in February 2019 that a pursuit's continuity is broken when officers completely lose a suspect's trail for more than a short time, as happened here." *Jones*, Amended Opin. at 14. In support of this conclusion, the panel stated that "*Johnson*, decided in 2001, made it clear to officers in 2019 that they may not sweep through an area and search the properties within it simply because they believe a suspect is somewhere therein." *Id*. at 15.

## II

Even assuming *arguendo* the panel's dubious premise that the Defendant Officers violated the Fourth Amendment when they entered Plaintiffs' yard without a warrant, the panel's further holding that the Defendant Officers violated clearly established law plainly contravenes controlling Supreme Court precedent concerning qualified immunity.

## A

"Although 'th[e] [Supreme] Court's caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate.'" *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (citation omitted). "Specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Id*. (simplified) (noting that, in that case, the relevant Fourth Amendment doctrine at issue was "excessive force," which "is an area of the law 'in which the result depends very much on the facts of each case'" (citation omitted)). "An officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.'" *Id*. at 105 (citation omitted). Consequently, in the absence of an "obvious case," the party seeking to defeat qualified immunity—here, Plaintiffs—"must identify a case that put [the officers] on notice that [their] specific conduct was unlawful." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 6 (2021). But if a precedent is "*materially* distinguishable" from the instant case, then it cannot be said to "govern the facts of this case" for purposes of qualified immunity. *Id*. (emphasis added).

Under these standards, the Defendant Officers are clearly entitled to qualified immunity. Given the distinctive and difficult Fourth Amendment question presented here—namely, whether the prompt recovery of a temporarily lost hot pursuit of a dangerous suspect justifies a warrantless entry into a specific property—this is not an "obvious case"

in which the general Fourth Amendment standards will supply a clear answer "even without a body of relevant case law." *Rivas-Villegas*, 595 U.S. at 6 (citation omitted). Nor did the panel contend that it was. Consequently, "to show a violation of clearly established law," Plaintiffs had to "identify a case that put [the Defendant Officers] on notice that [their] specific conduct was unlawful." *Id*. In holding that Plaintiffs had carried that burden, the panel relied solely on this court's 2001 decision in *United States v. Johnson*, 256 F.3d 895 (9th Cir. 2001) (en banc). *See Jones*, Amended Opin. at 14–15. But *Johnson* is "materially distinguishable and thus does not govern the facts of this case." *Rivas-Villegas*, 595 U.S. at 6.[2]

In *Johnson*, an officer attempted to arrest a misdemeanor suspect (Smith) who was wanted on "five outstanding arrest warrants for misdemeanor offenses," including DUI and resisting arrest. 256 F.3d at 899 & n.1. Smith, however, broke free and ran away. *Id*. at 899. The officer got in his vehicle and attempted to follow Smith but lost sight of him when Smith went off the road into the "thick brush" of the woods. *Id*. at 899. The rural area was "sparsely populated," and each property, including defendant Johnson's adjacent property, spanned multiple acres. *Id*. at 906. The officer "radioed for backup and requested a canine unit." *Id*. at 899.

---

[2] The Supreme Court has yet to clarify whether even an on-point circuit precedent can qualify as controlling authority for purposes of qualified immunity, *see District of Columbia. v. Wesby*, 583 U.S. 48, 66 n.8 (2018) ("We have not yet decided what precedents—other than our own— qualify as controlling authority for purposes of qualified immunity."); *Reichle v. Howards*, 566 U.S. 658, 665–66 (2012) (reserving the question whether court of appeals decisions can be "a dispositive source of clearly established law"); *see also Rivas-Villegas*, 595 U.S. at 5 (same).

While waiting for backup to arrive, the officer followed a nearby driveway and arrived at Johnson's gated property, which was locked. *Id.* The officer then left the trail completely and returned to the scene of his initial confrontation with the suspect to grab a pepper spray cannister that he had dropped earlier. *Id.* He returned to the locked gate and waited for an additional 15 minutes for backup to arrive. *Id.* at 899–900. Finally, over 30 minutes since the officer last saw the suspect disappear into the woods, the officers broke into Johnson's yard based on a "gut feeling" that the suspect would be there. *Id.* at 898, 905. While searching Johnson's property, the officers detected the clear smell of marijuana coming from a shed. *Id.* at 900. However, they did not find Smith. *Id.* After obtaining a warrant to search the shed, the officers found 553 marijuana plants, and Johnson was later indicted. *Id.*

Johnson moved to suppress the evidence, but the district court denied the motion, stating that the warrantless search was justified under the hot pursuit exception. *Johnson*, 256 F.3d at 900. A panel of this court affirmed, but after en banc rehearing was granted, the en banc court reversed and remanded. The en banc court remanded as to whether the area of the shed was within the "curtilage" of Johnson's home that is protected by the Fourth Amendment against warrantless searches, but the court held that, if it was, then the warrantless search was not justified. *Id.* at 897–98. The court held that the officers did not have probable cause to believe that Smith was on Johnson's property, because once Smith entered the woods, "Smith's options were unlimited" and his choices for "hiding places [were] potentially endless," and the officers had nothing more than a "gut feeling" that he might be on Johnson's property. *Id.* at 906–07. The court also held that the warrantless nature of the

entry was not justified by the "hot pursuit exception to the warrant requirement." *Id*. at 907. The officers had lost sight of Smith, and for the ensuing 30 minutes they "received no new information about where Smith had gone." *Id*. at 908. Meanwhile, Smith had "not run into a confined area," but had instead run "into a wooded area where he was free to run for over a half hour." *Id*. Under these circumstances, the court held, "the continuity of the chase *was terminated permanently*." *Id*. (emphasis added). The court also held that Smith's flight from the misdemeanor offense of resisting arrest "weighs heavily" against a "finding of exigent circumstances." *Id*.

*Johnson* is materially distinguishable in multiple respects from this case. Most importantly, the pursuit here was not "terminated permanently," *Johnson*, 256 F.3d at 908, because the Defendant Officers' continued investigation led them to develop probable cause that the suspect was in Plaintiffs' yard. This is thus not a case, like *Johnson*, in which the officers, during the period after losing sight of the suspect, "no longer had any idea where [the suspect] was." *Id*. Unlike *Johnson*, the suspect here did not run into a vast woods that afforded "unlimited" options to escape, *id*. at 906; on the contrary, the officers reasonably believed that he had "run into a confined area," namely, the limited perimeter the officers had established before developing probable cause as to which specific yard he might be in, *id*. at 908. (The fact that Shapiro ultimately turned out not to be in Plaintiff's yard or within the perimeter makes no difference; the *ex ante* authority to conduct a search does not turn on the *ex post* result.) And, in contrast to the officer in *Johnson*, who made no efforts to pursue Smith for 30 minutes while he waited for backup, the officers here were continuously working to establish a

perimeter and then to find the suspect. Most importantly, because the officers in *Johnson* never developed any subsequent information to establish probable cause that they had *recovered* a temporarily lost trail, *Johnson* simply cannot be viewed as having *clearly established* the answer to the question whether a temporarily lost trail can be promptly recovered. Finally, in contrast to the minor misdemeanors at issue in *Johnson*, the suspect here was suspected of a violent domestic battery misdemeanor. *See Lange v. California*, 594 U.S. 295, 305 (2021) (noting that, because "many perpetrators of domestic violence are charged with misdemeanors, despite the harmfulness of their conduct," "a felon is not always more dangerous than a misdemeanant" (simplified)). The panel was thus flatly wrong in concluding that *Johnson* clearly established that the officers' conduct here was unlawful.

The panel's amended opinion only makes things worse and underscores that qualified immunity was wrongly denied here. In its amended opinion, the panel attempts to make *Johnson* look like a better fit to the facts of this case by improperly altering its prior quotation from *Johnson*'s key holding. The panel's original opinion accurately quoted *Johnson*'s holding that "there is no hot pursuit where 'the continuity of the chase was terminated permanently.'" *Jones*, 150 F.4th at 1036 (quoting *Johnson*, 256 F.3d at 908). But this case does not fit that rule because, as I have explained, the continuity of the chase here was not "terminated permanently" given that the trail was promptly recovered. Rather than acknowledge that *Johnson* is thus materially distinguishable and does not govern this case, the panel instead now doctors its quotation from *Johnson* so as to reframe that decision's holding in a broader way that will better fit this case. Specifically, the above-quoted phrase has

been changed to now say that "there is no hot pursuit where 'the continuity of the chase [has been] terminated' *definitively*." *See Jones*, Amended Opin. at 12 (alterations in original) (emphasis added); *see also id*. at 14 (adding this same quote in a truncated form that deletes the word "permanently"). This alteration is significant, because it attempts to recast *Johnson*'s holding so that it would extend, not merely to a pursuit whose continuity was terminated "permanently" (and therefore *never recovered*), but also to one that was in some sense "terminated definitively" (such that it would not count that the trail *was* promptly recovered). But qualified immunity turns on what the relevant precedents actually say and not how they might be misquoted by future panels. *See Estate of Hernandez v. City of Los Angeles*, 139 F.4th 790, 827 (9th Cir. 2025) (en banc) (Collins, J., concurring in part and dissenting in part) (stating that, under a proper understanding of qualified immunity doctrine, officers must be able to "rely on what our opinions actually say" and should not have to "consider that future panels may take considerable liberties with selectively quoting the opinion's language").

For all of these reasons, *Johnson* does not "squarely govern[]" this case and does not place its outcome "beyond debate." *Kisela*, 584 U.S. at 104 (citations omitted). By holding that *Johnson* did clearly establish the relevant law here, the panel once again relied on an overbroad reading of precedent and thereby disregarded the Supreme Court's repeated admonition that we must not "define clearly established law at a high level of generality." *Id.* (simplified). The Defendant Officers here were entitled to qualified immunity.

**B**

In addition to its erroneous reliance on *Johnson* as having clearly established the relevant law, there are several additional respects in which the panel's decision here conflicts with relevant Supreme Court authority.

The panel's original opinion held that it is "clearly established" law that the loss of a suspect's trail for as few as 18 minutes means any hot pursuit has been definitively terminated and cannot be recovered, and it remarkably reached this conclusion without giving any consideration to the nature of the underlying crime at issue or the dangerousness of the suspect in this case. *See Jones*, 150 F.4th at 1036–38. In its amended opinion, the panel has now belatedly added a footnote minimizing the dangerousness of the suspect here, but the amendment only makes things worse because the new footnote squarely conflicts with Supreme Court precedent. *See Jones*, Amended Opin. at 13 n.2.

The panel's new footnote introduces a further error by explicitly reaffirming *Johnson*'s overbroad comment that a fleeing suspect's commission of a "misdemeanor" "weighs heavily against" a finding of exigent circumstances. *See Jones*, Amended Opin. at 13 n.2 (quoting *Johnson*, 256 F.3d at 908). That sweeping comment did not survive the Supreme Court's decision in *Lange*, which emphasized the importance of dangerousness to the hot pursuit inquiry and expressly noted—citing "domestic violence" offenses in particular—that "a felon is not always more dangerous than a misdemeanant." 594 U.S. at 305 (simplified). The panel's new footnote, and its reliance on *Johnson*'s dismissal of misdemeanors, also cannot be squared with *Stanton v. Sims*, 571 U.S. 3 (2013), in which the Supreme Court summarily

and unanimously reversed this court for denying qualified immunity based on a similar overreading of *Johnson*'s discounting of the seriousness of misdemeanors.  Citing the very same discussion in *Johnson*, this court denied qualified immunity in *Stanton*, holding that "[i]t should have been clear to Stanton, however, from Supreme Court and Ninth Circuit decisions that law enforcement actions involving a misdemeanor offense will rarely, if ever, justify a warrantless entry."  *Sims v. Stanton*, 706 F.3d 954, 964 (9th Cir. 2013) (citing, *inter alia*, "*Johnson*, 256 F.3d at 908 (clearly established since 2001)").  The Supreme Court reversed, holding that this court had read such statements in *Johnson* "far too broadly."  *Stanton*, 571 U.S. at 9 (noting the *Stanton* panel's reliance on a similar accompanying footnote in *Johnson*).  The Court instead held that the law governing the hot pursuit of misdemeanants, including the role of dangerousness in that analysis, was not clearly established, given the post-*Johnson* conflicting precedent within the Ninth Circuit itself and given that "the federal and state courts of last resort around the Nation were sharply divided." *Id*. at 10.  The panel's resuscitation of this discredited aspect of *Johnson* is plainly wrong, and it shows that we have learned nothing from the unanimous reversal we suffered in *Stanton*.**³**

---

**³** The panel's downplaying of the suspect's dangerousness here is also factually inaccurate.  The panel's suggestion that any danger here was mitigated by the fact that an officer stayed with the victim during the pursuit makes no sense: the whole point of the pursuit was to detain the dangerous suspect whose flight *required* the officer to temporarily guard the victim during the pursuit.  To the extent that the panel's amended opinion now suggests that the pursuit could perhaps have been maintained if the officers had left the victim unguarded, that strikes me as perversely illogical.  Moreover, a fleeing suspect with a known history of domestic violence who leaps into a neighbor's backyard would

*Stanton* underscores the panel's error in this case in a further respect.  Here, just as in *Stanton*, a variety of federal and state court decisions that have addressed the specific question presented here have reached results contrary to the panel's claim that that question has actually been long settled by general principles from a decades-old case. *See Stanton*, 571 U.S. at 9–10 (citing two state intermediate appellate decisions and two federal district court opinions).  Here, several post-*Johnson* cases have upheld, as falling within the hot pursuit exception, pursuits in which the officers briefly lost track of the suspect but then, through quick and continuous efforts, promptly regained the trail.  *See*, *e.g.*, *Prado v. Police Dep't of East Palo Alto*, 2018 WL 4103175, at \*1, 4 (Cal. Ct. App. Aug. 29, 2018) (finding hot pursuit where an officer lost sight of the suspect disappearing into private property at a dead-end street and fleeing to the west, and other officers created a perimeter while the chasing officer, making use of information developed during the pursuit, made warrantless entries into two separate yards near the residence where the suspect disappeared and ultimately shot the plaintiff's pit bull in one of the yards); *United States*

reasonably be considered to be a danger to the community generally and not only, as the panel would have it, to "co-habitants."  *See Jones*, Amended Opin. at 13 n.2.  Indeed, it is surprising to see the panel make such a point in this case, given that the canine officer's report stated that he conducted a records check of the fleeing suspect *before* he deployed his police dog and that he thereby learned that the suspect "had an extensive criminal history, which included several violent offenses such as domestic [violence] with strangulation, assault with a deadly weapon, carrying a concealed weapon and robbery."  Based on what they knew about Shapiro, the officers concluded that he was a danger to "anybody else he comes in contact with in the neighborhood."  The panel is therefore quite wrong to suggest that this violent suspect did not present any danger to the neighbors whose yards he was suspected of jumping into.

*v. Fuller*, 572 F. App'x 819, 819–21 (11th Cir. 2014) (holding that the passing of 12 minutes between the suspects' fleeing from the stolen car and a detective's entry into defendant's property after another detective driving nearby announced that there were suspicious people in defendant's backyard did not render the hot pursuit "cold" because the detectives were "engaged in a single pursuit that was continuous"); *United States v. Red Bird*, 2020 WL 7209760, at *1, 6–7 (D.S.D. Aug. 20, 2020) (finding hot pursuit where officer, seeing a suspect flee, drove one street down to unsuccessfully cut him off but recovered trail using footprints in snow); *United States v. White*, 185 F. Supp. 3d 1295, 1299–1301, 1304–10 (D. Utah 2016) (finding hot pursuit exception applied to a warrantless entry where, after losing track of a suspected felon when he entered into a multi-building complex, the officers recovered the trail by using the information developed during the pursuit to narrow down to one apartment unit on the top floor).  This conflicting caselaw further "bolster[s]" the conclusion that qualified immunity should have been granted here.  *Stanton*, 571 U.S. at 10.

*        *        *

For the foregoing reasons, the panel's decision is flatly contrary to controlling Supreme Court authority, and we should have reheard this case en banc.  I respectfully dissent from our denial of rehearing en banc.